No. 97-060

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 231

JAMES W. GIRARD,

Petitioner and Respondent,

and

DONALD and JANYTH GIRARD,

Intervenors and Respondents,

v.

BRUCE E. WILLIAMS, SANDRA WILLIAMS,

and FRANK D. LITKE, JR.,

Respondents and Appellants.

APPEAL FROM: District Court of the Twenty-First Judicial District,

In and for the County of Ravalli,

The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

T. Geoffrey Mahar (argued); James A. Haynes Law Office, Hamilton, Montana

Vincent Stark; Newman & Boyer Chicago Illinois

(for Appellant Frank D. Litke, Jr.)

For Respondents:

Judith A. Loring (argued), Attorney at Law, Stevensville, Montana

(for Intervenors and Respondents Donald and Janyth Girard)

Argued: October 9, 1997

Submitted: October 30, 1997

Decided: September 15, 1998

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

**¶ Frank D. Litke, Jr. (Frank) appeals from the judgment entered by the Twenty-First Judicial District Court, Ravalli County, on its Findings of Fact, Conclusions of Law and Decree of Custody granting Donald (Don) and Janyth (Jan) Girard full and permanent legal custody of David and Michael Girard. We reverse.**

**¶ The dispositive issue on appeal is whether the District Court erred in determining that Don and Jan had standing to intervene in the proceedings.**

BACKGROUND

**¶ Frank met Bonnie Girard (Bonnie) in Arizona in 1986 and they developed an**

intimate relationship. At the time she met Frank, Bonnie was married to James Girard (Jim) and they remained married until Bonnie's death in 1990. On May 13, 1987, Bonnie gave birth to Frank David Litke, III (David). While David was given Frank's last name, his birth certificate listed Jim as the natural father. In August 1987, Frank filed a complaint in the Superior Court of Arizona, in and for the County of Maricopa (Arizona Superior Court), to establish paternity of David. Bonnie filed an answer in which she admitted that Frank was David's natural father. Frank did not pursue this complaint, but he remained convinced that he, rather than Jim, was David's biological father.

¶ Frank was arrested on January 3, 1988, and subsequently incarcerated in an Arizona state prison as the result of a revocation of probation for a previous theft conviction. While Frank was in prison, Bonnie gave birth to Frank Thomas Litke Girard (Michael) on June 3, 1988. Again, while Michael's name includes Frank's last name, his birth certificate listed Jim as the natural father.

¶ Jim was incarcerated in a federal penitentiary in Arizona on September 10, 1990, after being convicted of possessing a sawed-off shotgun. The two infants remained with Bonnie. On December 21, 1990, Bonnie was murdered in her home. The record indicates that David and Michael were alone with Bonnie's body for approximately 24 hours before they were found and that they likely witnessed the murder. Both children continue to experience emotional and psychological problems resulting from this traumatic event.

¶ Following Bonnie's death, the Arizona Department of Economic Security (ADES) contacted Jim in the federal prison to determine where to place the children and, at Jim's suggestion, the children subsequently were transported to Montana to live with Jim's brother and sister-in-law, Don and Jan. David and Michael arrived in Montana in December of 1990, and have resided with Don and Jan since that time. Having no knowledge of Frank's relationship with Bonnie or the children, the ADES did not contact Frank regarding the children's placement at that time, nor was he aware of the ADES's actions until after the children had been removed from Arizona. The ADES denied Frank's subsequent request to be told where the children had been placed.

¶ In February of 1991, Frank's mother, Sandra Williams (Williams), and her husband filed a paternity action in the Arizona Superior Court, naming both Frank

and Jim as respondents and requesting the court to determine that Frank was the natural father of David and Michael and to award custody of the boys to either Frank or Williams. Frank claims that he instigated the filing of the Arizona paternity action after learning that Bonnie had been killed and the children had been removed to Montana.

¶ Frank was released from prison in early 1993 and, in March of 1993, the Arizona court amended Williams' paternity complaint to make Frank a petitioner, rather than a respondent, in the action. Jim participated actively in the paternity action and contested various of the Arizona court's orders, including an order that he and Frank submit to blood testing, through a number of appeals. He eventually had a blood group typing test completed, the results of which were consistent with his being the children's biological father, but did not undergo the DNA blood testing ordered by the Arizona court. Frank's DNA blood test indicated a greater than ninety-nine percent probability that he was the father of both David and Michael.

¶ Jim was released from the federal penitentiary in October of 1991 and moved to Ravalli County, Montana, where he resided with Don, Jan and the children. In April of 1992, Jim petitioned the Fourth Judicial District Court (now the Twenty-First Judicial District Court), Ravalli County, to legally change the names on the children's birth certificates to remove the name Litke. At the hearing on his petition for name change, Jim testified that he was the children's natural father. He did not give notice of the name change proceeding to either Frank or Williams and did not disclose to the District Court that the children were the subject of an ongoing paternity action in Arizona.

¶ On April 2, 1993, Jim filed a Verified Petition for Custody in the Twenty-First Judicial District Court, alleging that he was the presumed natural father of David and Michael pursuant to § 40-6-105, MCA, and that it would be in the children's best interests to award him sole and permanent custody of the children. Jim named Frank and Williams as respondents in the action and acknowledged that Frank might assert that he, rather than Jim, was the children's natural father. The petition disclosed the ongoing paternity and custody action in Arizona, but stated Jim's belief that Arizona did not have jurisdiction to determine custody of the children. In this regard, Jim alleged that the District Court had sole and exclusive jurisdiction of the custody issue pursuant to the Uniform Child Custody Jurisdiction Act (UCCJA), §§ 40-7-101 through 40-7-125, MCA, because the children had lived in Montana since December

1990, thus making Montana a more appropriate forum in which to determine custody. The verified petition requested the District Court to assume jurisdiction under the UCCJA in order to determine custody of the children, to award sole and exclusive custody to Jim, and to determine that neither Frank nor Williams had any rights or obligations with respect to either child. Frank responded to Jim's petition for custody by asserting that he was the children's natural father and that Jim had no blood relationship with either David or Michael. Frank requested the District Court to stay the proceedings on the petition for custody until the Arizona court ruled on the children's paternity and, thereafter, a determination could be made as to whether further custody litigation was necessary.

¶ On May 11, 1993, the District Court and the Arizona Superior Court conferred by telephone regarding the simultaneous proceedings and determined that the Arizona court would retain jurisdiction over the pending paternity action. Once paternity was established, the courts would confer again to determine whether custody was still an issue and, if so, which court should exercise jurisdiction over the custody issue under the UCCJA. Pursuant to a stipulation of the parties, the District Court ordered that Jim would have temporary custody of David and Michael pending the outcome of the litigation. In a second telephone conference, the courts again determined that Arizona had, and would retain, jurisdiction to render a final adjudication on the paternity issue. They further determined that the District Court had jurisdiction over the custody issue, the Arizona court would enter no orders regarding custody of the children and the Montana custody proceeding would be stayed pending the Arizona paternity determination.

¶ On February 17, 1994, the Arizona Superior Court entered its order decreeing that Frank was the natural and biological father of David and Michael. Based on its previous communications with the District Court, the Arizona court specifically declined to enter any custody orders and deferred jurisdiction over the custody issue to Montana. Frank subsequently moved the District Court to recognize the Arizona paternity order and grant him visitation with the children during the pendency of the custody proceeding. The District Court granted Frank's motion to recognize the Arizona paternity order, but denied his motion for visitation. The parties proceeded with the Montana custody action.

¶ Jim died on October 28, 1994. Don and Jan then moved the District Court to either substitute them as petitioners in Jim's place or, in the alternative, allow them to

intervene in the custody action. Frank opposed the motion on the basis that Don and Jan did not have standing to petition for custody of David and Michael. He also moved the court for an immediate judgment on the merits in his favor and custody of the children. The District Court entered its Findings of Fact, Conclusions of Law and Order permitting Don and Jan to intervene in the custody action and implicitly denying Frank's motion for immediate judgment on January 13, 1995. The court also ordered that Don and Jan would retain temporary custody of the children pending its ultimate custody determination. Don and Jan, as intervenors, subsequently filed a verified petition for custody of David and Michael.

¶ The District Court held a hearing on the merits of the custody proceeding in February and March of 1996. Its subsequent Findings of Fact, Conclusions of Law and Decree of Custody granted Don and Jan full and permanent legal custody of David and Michael and provided Frank with the opportunity for future visitations with the children. Judgment was entered accordingly and Frank appeals.

DISCUSSION

¶ Did the District Court err in determining that Don and Jan had standing to

intervene in the proceeding?

¶ It has long been the law in Montana that a natural parent has a legal right to the custody of his or her child which, in the absence of a showing that the natural parent has forfeited that right, prevails over the interest of a third party seeking custody. See, e.g., August v. Burns (1927), 79 Mont. 198, 219-20, 255 P. 737, 744; In re Bourquin (1930), 88 Mont. 118, 123-24, 290 P. 250, 251-52; Henderson v. Henderson (1977), 174 Mont. 1, 10, 568 P.2d 177, 182. Indeed, in recent years, we have recognized that a parent's right to the custody of his or her natural child is not merely a matter of legislative enactment, but is a fundamental, constitutionally protected right. Matter of Guardianship of Doney (1977), 174 Mont. 282, 286, 570 P.2d 575, 577 (citing Stanley v. Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59); Matter of Paternity of Vainio (1997), 284 Mont. 229, 234, 943 P.2d 1282, 1285. Consequently, the ability of a third party--whether an individual or an entity such as a state agency--to interfere with the natural parent-

child relationship must be closely monitored. <u>See</u> In re A.R.A. (1996), 277 Mont. 66, 71, 919 P.2d 388, 391; Matter of Guardianship of Aschenbrenner (1979), 182 Mont. 540, 544-45, 597 P.2d 1156, 1160.

¶ Recognizing the importance of the rights involved in the natural parent-child relationship, the Montana Legislature has enacted a variety of statutory schemes pertaining to custody of children and termination of parental rights, and regulating the manner in which third parties may intercede in the parent-child relationship. We previously have noted at least five such statutory schemes in Montana and observed that, although there is a degree of similarity as to general subject matter, each statutory scheme has specific purposes and procedures which must be followed to ensure that a judgment or order in a given case is valid. <u>Guardianship of Aschenbrenner</u>, 182 Mont. at 552-53, 597 P.2d at 1164.

¶ Before briefly reviewing these statutory schemes and the various requirements thereunder, we note that the Legislature revised many of the statutes discussed in this opinion in 1997. The majority of the substantive amendments enacted by the 1997 Legislature and, in particular, the amendments to the statute on which we base our decision here, are applicable only to proceedings initiated after October 1, 1997, however, and do not apply to this case. As a result, all statutory references and citations below are to the 1995 version of the Montana Code Annotated (MCA).

¶ Title 41, Chapter 3 of the MCA provides procedures by which the state may become involved in the care and custody of children in Montana and, when necessary, remove a child from a parent's custody or terminate the legal parent-child relationship. <u>See</u> <u>generally</u> Title 41, Chapter 3, parts 3, 4 and 6, MCA. Under these provisions, the custody of a child may be transferred from a natural parent to the state or other third party only upon a court order entered after a finding that the child is a youth in need of care. Section 41-3-406(1), MCA. A youth in need of care determination must be based on a finding that the child is abused or neglected (§ 41-3-102(17), MCA), which includes physical or mental injury to the child, sexual abuse, failure to provide adequately for the child's basic necessities although financially able to do so, and abandonment by leaving the child under circumstances which make it reasonable to believe the parent does not intend to resume care of the child. Section 41-3-102(7), MCA. Title 41 also sets forth criteria for the termination of the parent-child legal relationship and expressly requires that a court make a specific finding that certain circumstances exist which warrant termination of parental rights. <u>See</u> §

41-3-609(1), MCA. These circumstances include, in general terms, written consent of the natural parent to the termination, abandonment by the parent, and failure to comply with a court-approved treatment plan after a child has been adjudicated a youth in need of care. Sections 41-3-609(1)(a) through 41-3-609(1)(d), MCA.

¶ Title 40, Chapter 8 of the MCA regulates adoption proceedings through which the natural parents' parental rights to the care and custody of a child are terminated and, essentially, transferred to the adoptive parent or parents. The natural parents generally must consent, in writing, to the adoption of their child. Section 40-8-111(1)(a), MCA. However, the consent of a natural parent is not required if his or her parental rights have been judicially terminated or if he or she has been convicted of specified criminal offenses, has been judicially deprived of custody of the child based on cruelty or neglect, has willfully abandoned the child, or has failed to contribute to the support of the child for a period of one year although able to provide such support. Sections 40-8-111(1)(a)(i) through 40-8-111(1)(a)(vi), MCA.

¶ The Uniform Parentage Act (UPA), set forth in Title 40, Chapter 6 of the MCA, provides a mechanism by which the legal parent-child relationship may be established between a father and child or, in some cases, a mother and child. The UPA sets forth a number of specific factual circumstances which will raise a rebuttable presumption that a person is the natural father of a child. Section 40-6-105, MCA. If a presumption of paternity is created, any interested party may bring an action to establish the existence, or nonexistence, of the father-child relationship. Section 40-6-107(1), MCA. If a child has no presumed father under § 40-6-105, MCA, however, there are limitations on who may bring a paternity action. Section 40-6-107(2), MCA. The UPA also includes provisions regarding personal and subject matter jurisdictional requirements, venue, pretrial proceedings, blood testing and evidence appropriate to a paternity action. See §§ 40-6-109, 40-6-111, 40-6-112, 40-6-113, MCA. Once a paternity action is initiated under the UPA, a court may determine whether a judicial declaration of a father-child relationship would be in the best interests of a child. Section 40-6-114(1), MCA. Furthermore, a final judgment or order declaring the existence or nonexistence of a father-child relationship may also include provisions relating to custody, visitation, financial support and any other matter in the best interest of the child. Section 40-6-116, MCA.

¶ Child custody and visitation matters also may be determined pursuant to the statutes contained in Title 40, Chapter 4 of the MCA, which are part of what is

commonly called the Uniform Marriage and Divorce Act (UMDA). Jurisdictional and procedural matters relating to child custody proceedings under the UMDA are set forth in § 40-4-211, MCA. Under this statute, a custody proceeding may be initiated by a parent filing a petition for dissolution or legal separation which includes a request for a custody determination, a parent filing a petition for custody or, in specified circumstances, a nonparent filing a petition for custody. Section 40-4-211(4), MCA. Custody must be determined in accordance with the best interests of the child and the court's determination must take into consideration, *inter alia*, the specific statutory criteria and presumptions set forth in § 40-4-212, MCA. A parent who is not granted custody of a child is entitled to reasonable visitation rights absent a finding by the court that such visitation would seriously endanger the child's physical, emotional, mental or moral health. Section 40-4-217(1), MCA.

¶ Finally, Title 72, Chapter 5 of the MCA provides a means by which a nonparent may be appointed guardian of a minor child in derogation of a living parent's parental rights. Such an appointment must be made by a court and only if "all parental rights of custody have been terminated or suspended by circumstances or prior court order." Section 72-5-222(1), MCA. Once appointed, the guardian has all the powers and responsibilities of a natural parent except for the obligation to financially support the child or be liable to others for the child's actions. Section 72-5-231, MCA.

¶ In light of this variety of statutory schemes relating to parental rights and child custody, it is clear that

> District Courts must identify and adhere to the proper procedure and standards to be used in the proceedings before them. Only then will the fundamental rights and relationship existing between parent and child be fully realized or, when necessary, properly severed.

Guardianship of Aschenbrenner, 182 Mont. at 553, 597 P.2d at 1164. In this regard, we emphasize the importance of an initial determination of the precise nature of the underlying proceeding involving custody of children. The criteria used in resolving whether, under given circumstances, a nonparent has standing to request custody of a child in opposition to a natural parent varies depending on the nature of the underlying proceeding. As a result, the proper analysis of a standing issue vis-a-vis a request for custody requires an initial determination of the precise nature of the case. Guardianship of

Aschenbrenner, 182 Mont. at 552-53, 597 P.2d at 1164.

¶ Here, the District Court granted Don and Jan's motion to intervene, but did not set forth the statutory basis on which it relied. Frank contends that this is a custody proceeding under the UMDA which is governed by the child custody statutes contained in Title 40, Chapter 4 of the MCA. He argues, on that basis, that the District Court erred in allowing Don and Jan to intervene in the custody action because Don and Jan failed to establish that he had voluntarily relinquished custody of the children and, absent such a showing, they do not have standing to seek custody of the children.

¶ Don and Jan contend that the UMDA is inapplicable in this case. Rather, they argue that the applicable statutory criteria are contained in the UPA provisions set forth in Title 40, Chapter 6 of the MCA. They assert that Jim's petition for custody, their motion to intervene and their subsequent petition all alleged paternity issues and requested the District Court to determine both the paternity and the custody of David and Michael and, as a result, the court correctly applied the UPA and case law interpreting those statutes.

¶ Thus, in resolving whether the District Court erred in allowing Don and Jan to intervene and petition for custody of the children, we first must determine whether the underlying proceeding is a paternity action or a custody action. The answer to that question will dictate the statutory criteria and case law applicable in analyzing whether the District Court erred in concluding that Don and Jan have standing in this matter.

## A. Nature of the proceeding below

¶ As discussed above, litigation relating to David and Michael has been ongoing in several courts since 1987. The specific proceeding with which we are concerned in this case began with the filing of Jim's verified petition in the District Court in April of 1993. The petition was entitled "Verified Petition for Custody" and the first allegation therein was that the purpose of the petition was to determine custody of David and Michael under the UCCJA. The petition further alleged that Jim is the natural father of the children and referenced the then-pending Arizona paternity case. The petition also stated Jim's position that, while the Arizona case requested both paternity and custody determinations, the Arizona court did not have

jurisdiction to award custody of David and Michael. According to Jim, Montana had exclusive jurisdiction over custody under the UCCJA. After alleging that Montana was the more appropriate forum in which to determine custody, the petition requested the District Court to communicate with the Arizona court "to the end that the custody issue may be litigated in the more appropriate forum . . ." and, ultimately, to award Jim sole and exclusive custody of David and Michael. Jim did not request the District Court to assume jurisdiction over, determine or otherwise address the issue of the children's paternity. Thus, Jim's petition clearly raised issues relating only to the custody of David and Michael.

¶ The District Court communicated with the Arizona Superior Court twice regarding the jurisdictional questions associated with the two pending cases and, after each communication, specifically declined to assume jurisdiction over the paternity issue. It also stayed the proceedings on Jim's petition for custody until the Arizona court rendered a final adjudication of paternity. When the Arizona court rendered its judgment that Frank was the natural and biological father of the children, the District Court formally recognized it as a final judgment on paternity and refused to address the repeated attempts by Jim, and subsequently by Don and Jan, to reopen the paternity issue in Montana. On this record, therefore, it is clear that the District Court did not consider paternity to be at issue in the Montana custody proceeding.

¶ Finally, we observe that the sole basis advanced by Don and Jan for standing to intervene and request custody in the District Court was § 40-4-211(4)(b), MCA, which allows a nonparent to petition for custody under the UMDA upon a showing that the child is not in the physical custody of one of his or her parents. They did not argue their standing to proceed in the action under the UPA paternity provisions. Thus, even Don and Jan considered the present case a custody proceeding, rather than a paternity proceeding, at the time they moved the District Court to allow them to intervene.

¶ On the basis of the record before us, we conclude that this is a proceeding between nonparents and the natural father to determine the custody of David and Michael. As a result, we review whether the District Court erred in granting standing to Don and Jan under the statutes and case law pertaining to child custody proceedings under the UMDA.

## B. Nonparent Standing in Child Custody Proceedings

¶ As stated above, the jurisdictional and procedural standards for child custody proceedings under the UMDA are set forth in § 40-4-211, MCA. Section 40-4-211(4)(b), MCA, authorizes the commencement of a child custody proceeding by a person other than a parent "only if [the child] is not in the physical custody of one of his parents." If that showing is made, the nonparent has standing to pursue the custody proceeding. In re Custody of R.R.K. (1993), 260 Mont. 191, 197, 859 P.2d 998, 1002 (citing Henderson, 174 Mont. at 5, 568 P.2d at 179). The standing requirement also must be satisfied in situations where, as here, a nonparent seeks to intervene in an ongoing custody proceeding based on the entitlement to bring an independent custody petition under § 40-4-211(4)(b), MCA. Custody of R.R.K., 260 Mont. at 201-02, 859 P.2d at 1005.

¶ It is undisputed in the present case that, at the time Don and Jan moved to intervene in the custody action, the children were living in their home. Thus, it could be said that they had possession, or "physical custody," of David and Michael. However, "physical custody" for purposes of establishing standing under § 40-4-211(4)(b), MCA, is not based simply on who has actual possession of a child at the time a custody proceeding is commenced. "Rather, the phrase 'relates to the custodial rights involved in the care and control of the child.' " Matter of K.M. (1996), 280 Mont. 256, 259, 929 P.2d 870, 872 (quoting Henderson, 174 Mont. at 5, 568 P.2d at 179). As a result, to establish standing, a nonparent must demonstrate that the child's parent has voluntarily relinquished his or her right to physical custody and must present evidence as to the duration of the separation between the parent and child. Custody of R.R.K., 260 Mont. at 200, 859 P.2d at 1004; Matter of K.M., 280 Mont. at 260, 929 P.2d at 872-73.

¶ While we have addressed the issue of whether a parent voluntarily relinquished custody of a child in both Custody of R.R.K. and Matter of K.M., we have not discussed what voluntarily relinquished means vis-a-vis an analysis of whether a nonparent has standing to petition for custody of a child under the UMDA. It is clear that a determination of whether a parent has voluntarily relinquished his or her right to the custody of a child is dependent on the particular facts and circumstances of a given case and, as a result, a precise, all-encompassing definition of the term "voluntarily relinquished" is neither possible nor helpful. However, an examination of the general meaning of the words may assist in applying the standard to the case

before us.

¶ "Voluntarily" is defined as "[d]one by design or intention . . . not accidental." black's law dictionary 1575 (6th ed. 1990). "Relinquish" is defined, in part, as "to renounce some right or thing." black's law dictionary 1292 (6th ed. 1990). Thus, in order for a parent to voluntarily relinquish his or her right to the custody of a child, he or she generally must manifest an intentional renouncement of the right to custody; a parent's custodial rights cannot be relinquished unconsciously or accidentally.

¶ Frank asserts that Don and Jan did not establish that he voluntarily relinquished his rights to custody of David and Michael and, therefore, the District Court erred in allowing Don and Jan to intervene in the custody action. While the District Court did not expressly address the standing issue in terms of whether Frank voluntarily relinquished his custodial rights, it found that Frank had abandoned the children as a result of his incarceration and concluded that a sufficient showing of dependency, abuse or neglect had been made to allow intervention. We review a district court's findings of fact to determine whether those findings are clearly erroneous. Matter of Custody of D.M.G., 1998 MT 1, ¶10, 951 P.2d 1377, ¶10, 55 St.Rptr. 1, ¶10. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court has misapprehended the effect of the evidence or if our review of the record leaves us with the definite and firm conviction that a mistake has been made. Custody of D.M.G., ¶10. We review a district court's conclusions of law to determine whether the conclusions are correct. In re A.R.A., 277 Mont. at 70, 919 P.2d at 391.

¶ Frank's first argument is that the District Court erred in finding that his incarceration constituted abandonment of the children. In addressing the court's abandonment finding, we note, at the outset, that abandonment is a statutory criterion in Title 41 to be evaluated in determining whether to grant the state temporary investigative authority or temporary custody and whether to terminate parental rights at the state's request. See §§ 41-3-102(7)(e), 41-3-401 through 41-3-406, 41-3-609, MCA. Abandonment is also a criterion in determining whether parental consent to an adoption is required under Title 40, Chapter 8 of the MCA. See § 40-8-111(1)(a)(iii), MCA.

¶ Section 40-4-211(4)(b), MCA, however, does not mention abandonment by a natural parent as a circumstance under which a nonparent may seek custody.

<u>Custody of R.R.K.</u>, wherein we adopted the voluntary relinquishment standard, also does not set forth "abandonment" as a consideration in analyzing whether a parent has physical custody of a child for purposes of determining nonparent standing in a child custody proceeding under the UMDA. In <u>Matter of K.M.</u>, however, the grandparents of the children at issue asserted that they had standing to request custody under § 40-4-211(4)(b), MCA, because one of the fathers had "abandoned" his children when he moved to another state. We concluded that the grandparents had not proven that the father abandoned his children and thereby voluntarily relinquished his right to custody. We did not separately address whether "abandonment," as that term is used in abuse, neglect and dependency proceedings and adoption proceedings, falls within the voluntary relinquishment of custody standard contained in § 40-4-211, MCA. <u>Matter of K.M.</u>, 280 Mont. at 260, 929 P.2d at 873.

¶ We discussed above the importance of recognizing and adhering to the standards and procedures contained in the various statutory schemes relating to child custody and parental rights. In light of the importance of delineating between the criteria contained in the different statutory schemes and the absence of an "abandonment" criterion in either § 40-4-211(4)(b), MCA, or <u>Custody of R.R.K.</u>, we conclude that abandonment terminology has no place in determining a nonparent's standing in custody proceedings under § 40-4-211(4)(b), MCA. Rather, the appropriate standard to be applied in considering a nonparent's standing in a custody proceeding under the UMDA is whether the natural parent has voluntarily relinquished the right to custody of the child. Under this standard, it is clear that the District Court improperly made a finding that Frank had abandoned his children.

¶ In making its abandonment finding, however, the District Court may have been equating abandonment via incarceration to voluntary relinquishment pursuant to the language in <u>Matter of K.M.</u> Thus, although we have concluded that abandonment is not a proper standard to use in the present case, we will review the court's finding as it relates to voluntary relinquishment of the right to David and Michael's custody. In determining whether substantial evidence supports the District Court's finding that Frank's incarceration resulted in abandonment, we review the record as it existed at the time the court ruled on the motion to intervene.

¶ Frank was incarcerated in Arizona for approximately five years. He testified at the hearing on the motion to intervene that, prior to Bonnie's death, he corresponded

with her and the children and telephoned them several times each month to check on how they were doing. He provided the District Court with the letters and cards Bonnie sent to him which refer to his two sons and discuss their future together as a family. Frank's testimony in this regard was corroborated by Jim's deposition testimony that he saw the letters Bonnie and Frank sent each other, and by Ted Estrada, a neighbor of Bonnie's who testified that Frank would call his house to contact Bonnie because she did not have a telephone. While Frank's financial support of Bonnie and the children was limited, he testified that he did attempt to provide clothing, food and toys for them with the assistance of his mother and a charity organization that worked through the prison system. Although Don and Jan provided evidence that other people helped support Bonnie and the children while Frank was in prison, their evidence did not controvert Frank's evidence of his attempts to provide support.

¶ Moreover, as soon as Frank found out that Bonnie had been killed and the ADES had sent the children to Montana, he initiated--through his mother--the Arizona paternity action to have himself established as the children's natural father and to gain their custody. He was not advised of the ADES's actions in advance and had no opportunity to assert his rights at that time. Frank also attempted to find out precisely where in Montana the children had been sent, but the ADES refused to provide him with that information.

¶ While it is true that Frank's incarceration resulted in an extended period of separation from the children, the evidence does not establish that he voluntarily renounced or relinquished his right to custody of David and Michael. On the contrary, Frank maintained contact with Bonnie and the children from prison, attempted to provide such support as he was able and initiated proceedings to establish his right to custody of the children as soon as he learned of Bonnie's death. He also has actively litigated this custody proceeding in Montana since its inception in 1993. Moreover, the record reflects that, prior to the final custody decree in this case, Frank requested visitation with David and Michael on four occasions. His first visitation request was in conjunction with his motion in March of 1994 to have the District Court recognize the Arizona Superior Court paternity order; the District Court denied this visitation request. Frank made subsequent requests in July of 1994, July of 1995 and December of 1995; only one of these requests was granted by the District Court. Frank's actions throughout this time period indicate his strong desire to be involved with and parent his children.

¶ We conclude that the mere fact of Frank's incarceration does not rise to the level of a voluntary relinquishment of his right to physical custody when considered in conjunction with his actions to maintain contact with his children, establish his paternity and seek their custody. Thus, we further conclude that the District Court's finding that Frank abandoned his children as a result of his incarceration--to the extent that finding may be equated to a finding of voluntary relinquishment--is not supported by substantial evidence and is, therefore, clearly erroneous.

¶ Frank also argues that the District Court erred in concluding that Don and Jan had made a sufficient showing of dependency, abuse or neglect by Frank pursuant to § 41-3-102, MCA, to allow intervention in the custody proceeding. He asserts that the court erred in applying Title 41 because no abuse or neglect proceeding had been initiated.

¶ As discussed above, Title 41, Chapter 3 of the MCA provides for proceedings instituted by the state to have children declared abused or neglected for purposes of removing a child from a parent's custody or terminating the legal parent-child relationship. See generally Title 41, Chapter 3, parts 3, 4 and 6, MCA. A county attorney or the state attorney general initiates such a proceeding by filing a petition alleging that a child is abused or neglected and requesting a district court to grant the state temporary custody or terminate the parent-child relationship. Sections 41-3-401(1) and (10), MCA. A court properly may make a determination that a child is abused, neglected or dependent only in a proceeding instituted pursuant to, and in conformity with, the provisions of Title 41, Chapter 3 of the MCA. In re Guardianship of D.T.N. (1996), 275 Mont. 480, 485, 914 P.2d 579, 582; Guardianship of Aschenbrenner, 182 Mont. at 551, 597 P.2d at 1163; Henderson, 174 Mont. at 9, 568 P.2d at 181. Such determinations--or other interjections of abuse and neglect considerations--are inappropriate and, indeed, erroneous as a matter of law if made in other types of statutory proceedings relating to the custody of children.

¶ In the present case, it is undisputed that no petition alleging abuse or neglect had been filed under Title 41, Chapter 3 of the MCA. Absent such a petition, the District Court had no jurisdiction to conclude that the children were dependent, abused or neglected under the provisions of Title 41, or otherwise raise considerations of dependency, abuse and neglect in this UMDA custody proceeding. See Guardianship of Aschenbrenner, 182 Mont. at 551, 597 P.2d at 1163; Henderson, 174 Mont. at 9, 568 P.2d at 181. As a result, we conclude that the District Court erred as a matter of

law in applying Title 41 to determine that Don and Jan had standing to intervene in the custody proceeding pursuant to § 40-4-211(4)(b), MCA.

¶ Notwithstanding our conclusions that the District Court erred in several regards, Don and Jan contend that the District Court's finding that Frank had not paid child support for the children supports a determination that Frank voluntarily relinquished his right to physical custody of David and Michael. On that basis, they argue that the District Court properly allowed them to intervene in this custody proceeding.

¶ In order to establish standing to seek custody of a child pursuant to § 40-4-211(4)(b), MCA, a nonparent must present "evidence sufficient to convincingly prove" that the parent voluntarily relinquished his right to custody of the child. See Matter of K. M., 280 Mont. at 260, 929 P.2d at 873. While it is undisputed here that Frank has not paid child support for David and Michael, Don and Jan provide no legal authority for the proposition that failure to pay child support constitutes voluntary relinquishment of a parent's rights to custody of his children so as to provide them with standing in this case. As discussed above, a parent's failure to provide adequately for a child's basic necessities when financially able to do so is an express statutory basis for a finding that the child is a youth in need of care under Title 41, Chapter 3 of the MCA. See §§ 41-3-102(5), 41-3-102(7)(d) and 41-3-102(17), MCA. Similarly, a parent's failure to provide financial support for his or her child when able to do so is also a statutory exception to the requirement that a natural parent consent to the adoption of his or her child. See §§ 40-8-111(1)(a)(iv) and 40-8-111(1)(a)(v), MCA. Section 40-4-211(4)(b), MCA, however, contains no provision under which a parent's failure to pay support when able to do so can serve as a basis for a nonparent's standing to seek custody of that parent's children. Nor do our cases under § 40-4-211(4)(b), MCA, hold--or even suggest--that failure to pay child support when able constitutes voluntary relinquishment of a parent's right to the custody of his or her child. In interjecting the failure to pay support consideration into its determination of whether Don and Jan had standing to intervene in this UMDA custody proceeding, the District Court again failed to identify and adhere to the standards applicable to the proceeding before it.

¶ Furthermore, Don and Jan presented no evidence at the hearing on their motion to intervene that Frank had the financial ability to pay child support either during the time he was incarcerated or during the two years between his release from prison

and the hearing. Nor did they controvert Frank's testimony that he attempted to provide clothing, food and toys for the children, with the assistance of his mother and prison charitable programs, while he was incarcerated. Thus, in addition to the District Court's error in injecting the support consideration into this proceeding, its finding that Frank had not paid child support was incomplete in failing to take financial ability into account. Had financial ability been taken into account, the finding would not be supported by substantial evidence and, as a result, would be clearly erroneous.

¶ We conclude that Don and Jan failed to establish that Frank voluntarily relinquished his rights to the custody of David and Michael. As a result, they have failed to meet the standing requirements which would entitle them to intervene in a UMDA custody proceeding pursuant to § 40-4-211(4)(b), MCA. We hold, therefore, that the District Court erred in determining that Don and Jan had standing to intervene.

¶ Prior to concluding this opinion, it is appropriate to comment on Justice Leaphart's dissent. The dissent's two main criticisms of our opinion are, first, that we have concluded this proceeding is a custody matter controlled by § 40-4-211(4), MCA, and then applied the criteria which govern such proceedings and, second, that we have not taken into account whether the children's "constitutional right to an established family" confers standing on the Girards to assert rights on behalf of their "established family." We address these matters in turn.

¶ First, our conclusion that the underlying proceeding is a custody matter under the UMDA is based on the record before us. As discussed above, that record indicates that the basis advanced by Don and Jan for standing to intervene and request custody in the District Court was § 40-4-211(4)(b), MCA. Apparently the dissent would prefer that we change the basis on which the case proceeded prior to reaching this Court. We are not at liberty to do so. While Don and Jan attempted to reopen some of the paternity issues during the District Court proceedings, they simply did not argue their standing to proceed in the action under the UPA paternity provisions or any basis other than § 40-4-211(4)(b), MCA. Thus, our duty is to determine whether they had standing on the basis on which they sought it--§ 40-4-211(4)(b), MCA. We have concluded that they did not.

¶ Moreover, the dissent apparently would have us ignore the fact that the Montana

Legislature has enacted different statutory schemes to govern various proceedings involving children and simply read provisions from one such scheme into others. As discussed at some length above, each of the separate statutory programs--involving adoption, paternity, custody and the like--has its own procedures and standards to be applied in proceedings thereunder. If the Legislature had desired or intended to make the procedures and standards in all of those separate statutory programs consistent, it could and would have done so; it did not. As a result, we are not free to pick statutory requirements from, for example, adoption or paternity proceedings and engraft them onto a custody proceeding. To "blend" the Legislature's separate statutory schemes in such a manner would require us to ignore the rules of statutory construction which guide this Court, as well as our case law, and intrude into the Legislature's rightful domain. This we cannot do.

¶ Finally, the dissent is simply wrong in contending that we should have considered the children's "constitutional right to an established family" in determining whether the Girards have standing to request custody. The reason we could not, and did not, take that subject into account is that it is not before us in this case. Neither Don and Jan nor the children's guardian *ad litem*--who was an active participant in the District Court proceedings--raised an argument about the children's constitutional rights in the District Court as a basis for granting standing to the Girards under § 40-4-211(4)(b), MCA. Consequently, and not surprisingly, that argument also was not raised on appeal. We must decide cases based on

the issues raised in the trial court and properly presented to us on appeal. In this case, those issues simply do not include the question of David and Michael's constitutional rights insofar as those rights might impact on Don and Jan's standing to seek custody under § 40-4-211(4)(b), MCA.

¶ Our holding that the District Court erred in allowing Don and Jan to intervene in the custody proceeding necessitates our further holding that the District Court's final decree granting permanent custody of the children to Don and Jan is without legal effect. As a result, Frank--the natural father of David and Michael--is entitled to custody of his children. In this regard, we are aware of--and concerned about--the children's emotional and psychological problems stemming from their mother's violent death and the subsequent upheavals in their lives. We also are aware that Frank and the children have had virtually no opportunity to know--or develop relationships with--each other and that the experts who testified in this case were

unanimous in cautioning that a sudden change in custody and removal of David and Michael from their current home would be detrimental to the children's well-being. Thus, while no legal basis exists for delaying the change in custody, we strenuously encourage the parties to work together in planning and implementing the custody transition so as to result in as little trauma to all involved--especially, the children--as possible.

¶ **Reversed and remanded for the entry of an order awarding custody of David and Michael to Frank.**

/S/ KARLA M. GRAY

We concur:

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ JAMES C. NELSON

Justice W. William Leaphart, dissenting.

¶ I dissent from the Court's holding that the Girards lack standing.

No

¶ The Court holds that this is a custody matter which is controlled by § 40-4-211(4), MCA (1995). Thus, in order for the Girards, as nonnatural parents, to establish standing they have to show that the children were not in the physical custody of one of their parents.

¶ The Girards argued that Frank's failure to pay child support for the children supports a determination that Frank voluntarily relinquished his right to physical custody. It is undisputed that Frank did not pay child support for David and Michael either during his incarceration or during the two years between his release from prison and the date of the hearing. Nonetheless, this Court concludes that since § 40-4-211, MCA (1995), does not make reference to lack of child support, it cannot form the basis for a finding of relinquishment of the right to physical custody. The Court's analysis fails to take into consideration that the requirement that the parent have "relinquished" his right to custody is itself not a specific statutory requirement. The house of cards upon which the Court's standing analysis is based is rooted in the provisions of § 40-4-211(4)(b), MCA (1995), which grant a nonparent standing to petition for custody "only if [the child] is not in the physical custody of one of his parents." The statute says nothing about a parent having "relinquished" his or her right to physical custody through lack of support or otherwise.

¶ It escapes me why, at this juncture, we find it necessary to revert to the precise wording of the statute and focus on the fact that it makes no mention of lack of child support. In addressing the issue of support in the context of custody, I would interpret § 40-4-211(4), MCA (1995), consistently with Title 41, Chapter 3, MCA, which provides that failure to provide for a child's basic necessities when financially able is a basis for a finding that the child is a youth in need of care. I would also interpret it consistently with § 40-8-111(1)(a)(iv), MCA (1995), which states that failure to provide support for one year excuses a petitioner for adoption from having to obtain the consent of the natural parent. A change in custody is certainly less severe to the natural parent than having the child adopted by another. If lack of support suffices for an adoption proceeding, it should likewise suffice for a custody proceeding. The legislature has said that failure to pay child support supports a finding that the youth is in need of care and also obviates the need to obtain consent of the parent for an adoption. Accordingly I have no problem concluding that failure to support, when able, constitutes voluntary relinquishment as required by our case law or, in the words of the statute, that it constitutes failure to exercise "physical custody." Section 40-4-211(4)(b), MCA (1995).

¶ I also dissent from the Court's holding that, even if lack of support were properly considered, the record would not support a finding of inability to support. Presumably this

holding relates back to the Court's earlier statement that the Girards did not refute Frank's testimony that he attempted to provide clothing, food and toys for the children, with the assistance of his mother and prison charitable programs, while he was incarcerated. This testimony may be sufficient to explain his lack of support while he was incarcerated, but it does not address his lack of support for the two years after he was released from prison-- a period of time during which he had a job and thus was able to make support payments. Accordingly, I find no basis for concluding that "[h]ad financial ability been taken into account, the finding [regarding Frank's ability to support] would not be supported by substantial evidence and, as a result, would be clearly erroneous." I would hold that lack of support is a proper consideration under § 40-4-211(b), MCA (1995), and if, as the Court holds, financial ability was not properly taken into account, I would remand for further proceedings and findings in that regard.

¶ My other concern, which is more substantive, is that the Court has disposed of this matter on the narrow issue of the Girards' standing to petition for custody without taking into consideration the children's constitutional right to an established family and whether that right confers standing on the Girards to assert rights on behalf of the "established family."

¶ In the final analysis, the Court has made a custody determination after considering the rights of the biological parent but not the rights of the children. This stems, in large part, from our failure to distinguish between the implications of proceedings that seek to terminate parental rights and proceedings that seek to determine custody. For example, in In re A.R.A. (1996), 277 Mont. 66, 919 P.2d 388, we held § 40-4-221, MCA, unconstitutional to the extent that it required a custody dispute initiated by a stepparent be resolved according to the best interest of the child. We reasoned that the statute infringed upon the rights of the natural parent who had not been adjudicated "unfit." In *In re A.R.A.*, we relied heavily on Matter of Guardianship of Doney (1977), 174 Mont. 282, 570 P.2d 575, which was a case involving termination of parental rights. In *Guardinaship of Doney*, we required a showing of abuse or neglect prior to terminating the natural father's rights as guardian of the children. *Guardianship of Doney*, 174 Mont. at 287, 570 P.2d at 578. That high standard was appropriate in *Guardinaship of Doney* because the implications of terminating parental rights are so severe. A custody proceeding is, however, not so harsh as a termination of parental rights and, in the context of a custody proceeding such as this, the Court should not be employing a blind deference to the rights of the biological parent without considering or balancing those rights against the rights of the children.

¶ In addition to distinguishing between termination and custody proceedings, we should differentiate between cases involving the removal of children from the natural parent's home and cases involving reunification of children with a natural parent. Thus when the children's established home is with parties other than the natural parent(s), the rights of the natural parent have to be weighed against the children's rights to the "established family." By failing to weigh these interests, the Court ignores both the importance of stable family relationships and children's rights to have such relationships maintained.

¶ The United States Supreme Court has recognized that the "familial relationship" is more than a mere biological tie:

> [T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children . . . as well as from the fact of blood relationship.

Lehr v. Robertson (1983), 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (alteration in original) (citation omitted).

¶ **For this reason the Court held in *Lehr* that when an unwed father demonstrates a full commitment to the responsibilities of parenthood, his interests acquire substantive protection under the Due Process Clause because he has acted as a father toward the children.**

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Lehr*, 463 U.S. at 262, 103 S.Ct. at 2993-94, 77 L.Ed.2d at 627.

¶ In Matter of Paternity of Adam (1995), 273 Mont. 351, 903 P.2d 207, we addressed the question of whether to judicially declare the father-child relationship and grant the biological father the prerogatives of a parent. Following the lead of the Court in *Lehr*, we looked beyond the biological ties, applied a best interest test, and considered "the existence of a home environment; the stability of the present home and family; the extent to which uncertainty of parentage already exists in the child's mind; the efforts and commitments (if any) that the putative father has taken to establish supportive and financial ties with the child; as well as any other factors which may be relevant in assessing the potential benefits or detriments to the child." *Paternity of Adam*, 273 Mont. at 357-58, 903 P.2d at 211. The *Paternity of Adam* case involved a declaration of paternity, not custody. However, the children's interest in a home environment and stability are no less compelling in a custody proceeding than in a paternity proceeding. Their rights are, I submit, entitled to constitutional protection under Article II, Section 15 of the Montana Constitution.

¶ Children's rights to privacy are protected under the Montana Constitution, Article II, Section 15, and those rights deserve as much, if not more, protection than the privacy rights of the biological parent. One commentator has observed, and I agree, that biological connections are not the exclusive determining factor as to what constitutes a "family." Heather M. Lationo, Note, *Erger v. Askern: Protecting the Biological Parent's Rights at the Child's Expense*, 58 Mont. L. Rev. 599 (1997). Rather, the importance of family "stems from the emotional attachments that derive from the intimacy of daily association . . . ." Smith v. Organization of Foster Families (1977), 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35. Young children, unlike adults, have no psychological conception of relationships by blood ties. *See* Joseph Goldstein et al., Beyond the Best Interest of the Child 12 (rev. ed. 1979). Conversely, a child's perception of a parent is shaped by his or her day-to-day needs. *See* James B. Boskey, *The Swamps of Home: A Reconstruction of the Parent-Child Relationship*, 26 U. Tol. L. Rev, 805, 808 (1995).

¶ The rights of children to maintain healthy nurturing family attachments are no less than the rights of biological parents to raise their children. In In re Baby Boy C, the natural father of a child appealed the grant of a petition for adoption. In re Baby Boy C (D.C. 1993), 630 A.2d 670. The court in *Baby Boy C* recognized the rights of natural parents to raise their children but concluded that they "are not absolute and

must give way before the child's best interests." *Baby Boy C*, 630 A.2d at 682. The *Baby Boy C* court held that "a finding of parental unfitness is not a constitutional prerequisite to granting an adoption petition notwithstanding lack of parental consent." *Baby Boy C*, 630 A.2d at 682. Several other jurisdictions have similarly affirmed the rights of children to supportive family relationships. *See* In re Adoption No. A91-71A (Md. 1994), 640 A.2d 1085, 1096 (citation omitted) (holding that "the controlling factor [in] adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interests of the child"); Matter of Pima Cty. Juv. Severance Action (Ariz. 1994), 876 P.2d 1121, 1136 (holding that "[j]udges must simultaneously protect the parent's interests and safeguard the child's stability and security").

¶ Although the children in the present case had counsel appointed, their counsel asserted the rights of the children by adopting the position of the Girards. Thus when this Court found that the Girards had no standing, it indirectly held that the children had no standing and that their best interests would not be considered in making the custody determination.

¶ The Court determines that the Girards have no standing under § 40-4-211, MCA (1995), which grants standing to a nonparent "only if [the child] is not in the physical custody of one of his parents." Section 40-4-211(4)(b), MCA (1995). In interpreting this statute, this Court has held that "physical custody" does not really mean "physical" custody. Rather it means "custodial rights involved in the care and control of the child." Henderson v. Henderson (1977), 174 Mont. 1, 5, 568 P.2d 177, 179 (citiation omitted). Beyond that, we have held that a nonparent must demonstrate that the parent has voluntarily relinquished his right to physical custody. *See* Matter of K.M. (1996), 280 Mont. 256, 260, 929 P.2d 870, 872-73. Although it would seem that a parent would have to have "physical custody" before he or she can "relinquish" physical custody, we give natural parents the benefit of this test despite the fact that they may not, in fact, have exercised any "care and control of the child."

¶ I suggest that when the legislature used the term "physical custody," it was inviting us to make a distinction between: (1) cases in which the child is in the physical custody of the parent and the issue is whether the child will be removed from that custody; and (2) cases in which the child is not in the physical custody of the parent and the parent is seeking to be united or reunited with the child.

¶ When the children are not in the physical custody of one of their parents, it is incumbent upon the court to determine who does have physical custody of the children and whether the children have established a stable familial relationship with their non- biological parents. If the children have such an established family relationship, I would hold that the children, as well as their surrogate parents, have standing to assert privacy rights to the continuation of that relationship. The biological father seeking reunification has privacy rights as well. However, those rights are not as strong as they would be if he had both legal and "physical" custody and the issue was removal of the children from his established family.

¶ I would hold that nonpayment of support can constitute voluntary relinquishment of the right to custody under our holding in In re Custody of R.R.K. (1993), 260 Mont. 191, 859 P.2d 998. In the alternative I would hold that children have a constitutionally protected right to an established family and that the Girards, as the parents in the children's "established" family, with physical custody of the children, have derivative standing under § 40-4-211, MCA (1995), to litigate the issue of custody without having to establish that the biological father's rights have been terminated.

¶ This Court's recent decision in In re A.R.A. (1996), 277 Mont. 66, 919 P.2d 388, relying on Matter of Guardianship of Aschenbrenner (1979), 182 Mont. 540, 597 P.2d 1156, held that a court cannot, in a custody dispute between a biological parent and a third person, employ a "best interest of the child" test absent a termination of parental rights due to a finding of abuse and neglect or dependency. *In re A.R.A.*, 277 Mont. at 72, 919 P.2d at 392. Although I concurred in that decision, upon further reflection I am not convinced that a biological parent who does not have physical custody and whose parental rights have not been terminated should be awarded custodial rights without the court first considering whether the children have established a stable family relationship with surrogate parents and whether a (re) unification with a biological parent would be in their best interests. *In re A.R.A.* seems to be based upon a premise that the children have no constitutional rights that need to be weighed in the custody process. This is not a valid premise. The children's right to an established, stable family environment is entitled to as much, if not more, constitutional protection than the biological parent's right to play his genetic trump card. The biological father certainly has constitutionally protected rights in asserting his parenthood. There is, however, nothing in our constitution which requires that recognition of his rights precludes recognition of any right of the children to their

**established family. Accordingly, I would overrule the *In re A.R.A.* and *In re Aschenbrenner* decisions to the extent that they deny surrogate parents, in the children's established family, standing to petition for custody unless the parental rights of the natural parent(s) have been terminated.**

/S/ W. WILLIAM LEAPHART

Chief Justice J. A. Turnage joins in the foregoing dissent.

/S/ J. A. TURNAGE

Justice James C. Nelson specially concurs.

¶77 I concur in the legal analysis and in the result of the Court's opinion. Given the record, the state of the law, and the arguments made on appeal, there was virtually no other choice. I am, nevertheless, in agreement with much of what Justice Leaphart has to say in

his dissenting opinion regarding children's constitutional rights in proceedings such as the one at bar.

¶78 Under our Montana Constitution, Article II, Section 15, children enjoy the same fundamental rights as adults. At a bare minimum these include inalienable rights to a clean and healthful environment, to pursue life's basic necessities, to enjoy a safe, healthy and happy life (Article II, Section 3) and to basic human dignity (Article II, Section 4).

¶79 Unfortunately, as in the instant case, these rights generally are not even factored into the arguments of the warring parties and their attorneys. On the other hand, where they are mentioned, the children's fundamental constitutional rights are typically trumped by the competing rights of the biological parent to custody and to parent his or her children--even in cases where the natural parent is dysfunctional, abusive and has little or no parenting skills or substantive relationship with his or her children. More often than not (and this case is an excellent example) the children's fundamental constitutional rights are simply ground up in the machinery of various statutory schemes weighted heavily in favor of this biologically-based right to custody and to parent and which exclude or marginalize other relationships that actually might be more in the children's (as opposed to the natural parent's) best interest.

¶80 The Court's answer to the dissent is, in my view, legally correct. Nonetheless, to the extent that Justice Leaphart speaks from the frustration of knowing that the result of our decision will be to cause these already traumatized children to lose the stable and loving home that they need, deserve and to which they are constitutionally entitled, then he speaks for me as well. The cold letter of the law has vindicated Frank's rights. Tragically, David's and Michael's were not even considered.

/S/ JAMES C. NELSON