
DA 08-0483

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2009 MT 326

MICHELLE KULSTAD,

       Plaintiff and Appellee,

v.

BARBARA L. MANIACI,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR 07-34
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Austin Nimocks (argued), Amy Smith, Alliance Defense Fund, Scottsdale, Arizona
Linda Osorio St. Peter, Attorney at Law, Missoula, Montana

       For Appellee:

              Elizabeth L. Griffing (argued), ACLU of Montana Foundation, Missoula, Montana
Susan G. Ridgeway, Attorney at Law, Missoula, Montana
Kevin H. Lewis, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, California

       For Amicus Montana Family Foundation:

              Patrick Flaherty, The National Legal Foundation, Virginia Beach, Virginia

       For Amicus Pacific Justice Institute:

              Peter D. Lepiscopo, Lepiscopo & Morrow, San Diego, California

       For Amicus National Assn. of Social Workers (NASW); NASW, MT Chapter; and American Academy of Pediatrics:

P. Mars Scott and Thorin A. Geist, Attorneys at Law, Missoula, Montana
Luann Simmons and Sara Jeruss, O'Melveny & Myers, San Francisco, California

For Amici Law School Professors:

James P. Reynolds, Reynolds, Motl and Sherwood, Helena, Montana

For Amicus Northwest Women's Law Center:

Daniel P. Semmens, Dorsey & Whitney, Missoula, Montana

_____

Argued:     April 17, 2009

Submitted:  April 28, 2009

Decided:    October 6, 2009

Filed:

_____
Clerk

2

Justice Brian Morris delivered the Opinion of the Court.

¶1 Far too often this Court faces a situation in which minor children have no adult fit to parent them. *See e.g. In re E.D.*, 2008 MT 216, 344 Mont. 228, 186 P.3d 1283; *In re M.P.*, 2008 MT 39, 341 Mont. 333, 177 P.3d 495; *In re Custody and Parental Rights of A.P.*, 2007 MT 297, 340 Mont. 39, 172 P.3d 105. This case presents the increasingly unusual situation of two adults fit to parent minor children, L.M. and A.M. The District Court awarded a parental interest in the minor children to Appellee Michelle Kulstad (Kulstad) over the objection of the Appellant Barbara L. Maniaci (Maniaci). The court also awarded Kulstad an interest in personal and real property. We affirm.

¶2 Maniaci presents the following issues on appeal:

¶3 Whether the court's application of §§ 40-4-211 and 40-4-228, MCA, to support Kulstad's claim of a parental interest violates Maniaci's fundamental constitutional rights as a parent.

¶4 Whether the court properly awarded Kulstad a parental interest.

¶5 Whether the court properly awarded Kulstad personal property and a property interest in the parties' home.

## PROCEDURAL AND FACTUAL BACKGROUND

Background

¶6 Maniaci moved to Clinton, Montana, in late 1994 or early 1995. Maniaci and Kulstad met in Montana in late 1995. Maniaci lived in a trailer on her sister's property and worked part-time as a chiropractor out of her sister's home. Kulstad lived in Seattle, Washington.

3

She worked in Seattle on business ventures and supported herself with her accumulated assets. The parties' relationship progressed to the point that they began staying with each other at their respective homes. Kulstad eventually moved to Montana in 1996 to live with Maniaci.

¶7 Kulstad and Maniaci exchanged rings on March 18, 1996. Kulstad and Maniaci wore the rings until the fall of 2006. Maniaci also gave Kulstad three anniversary cards. Maniaci represented Kulstad as her "partner" on numerous occasions. The parties attended couples counseling in 2002, 2003, and 2006. The parties' mutual friends regarded them as domestic and intimate partners, and later as co-parents.

¶8 Kulstad supported the parties primarily with her accumulated assets from 1996 to 2001. Kulstad and Maniaci had a joint automobile insurance policy naming each of them as insureds. Maniaci added Kulstad to the homeowner's insurance policy. Maniaci executed a living will that authorized Kulstad to make her end-of-life decisions.

Parental Interest

¶9 Kulstad and Maniaci periodically discussed the possibility of co-parenting a child. L.M. came unexpectedly to them in mid-February 2001 when Maniaci's chiropractic patient, Camilla Eddy (Eddy), inquired whether Kulstad and Maniaci had an interest in adopting her great grandson, who lived in Anaconda. Eddy believed that L.M.'s mother provided inadequate care. A couple of days later, Eddy, fearing for L.M.'s life, contacted the parties. Kulstad and Maniaci drove to Anaconda where L.M.'s natural mother relinquished custody to the parties.

4

¶10    Kulstad and Maniaci took L.M. to the hospital and entered his name as "L.L. Kulstad-Maniaci." Kulstad and Maniaci sought legal advice regarding same-sex adoptions. Their lawyer advised them that Montana law allowed only one of them to adopt L.M. The parties decided that Maniaci would be the adoptive parent. Kulstad and Maniaci agreed that L.M. would call only one of them "mom" and they further agreed not to hyphenate L.M.'s last name. Kulstad and Maniaci also agreed that they would function equally as parents even though only one of them could adopt L.M.

¶11    Kulstad and Maniaci participated in a home study with social worker Cynthia Garthwait (Garthwait) in July 2001 as part of the adoption process. Kulstad and Maniaci further participated in an adoptive post-placement report with Garthwait in April 2002. Maniaci represented to Garthwait at each meeting, and Garthwait understood, that Maniaci and Kulstad were in a committed relationship. Garthwait further understood that Kulstad would co-parent and support L.M.

¶12    Maniaci decided in 2003 that she wanted to adopt a baby girl. Kulstad initially disagreed with Maniaci about bringing another child into the home. Maniaci pursued the adoption over Kulstad's objection. Kulstad and Maniaci understood nonetheless that Kulstad would function as a parent to any second child that Maniaci adopted.

¶13    Kulstad and Maniaci participated in a home study with Dennis Radtke (Radtke) to adopt a second child. Maniaci represented to Radtke that Kulstad would co-parent and support A.M. Maniaci sent an email inquiry to the Human Rights Campaign in March 2003, about adopting a second child. Maniaci stated that she and her "partner" had completed a

5

private adoption and a home study "for our boy" and "now we would like to adopt a baby girl." Maniaci eventually adopted A.M. from Guatemala.

¶14     Kulstad lived with the children and functioned as a parent to the children on a day-to-day basis for the remainder of her relationship with Maniaci. Kulstad and Maniaci provided for the children's physical, psychological, and developmental needs much like any other two-parent family. Maniaci assumed primary responsibility for purchasing groceries and supplies or services for the children. Maniaci primarily cared for the children during the day while Kulstad worked outside the home. Kulstad cared for the children in the afternoon and early evening when Maniaci saw chiropractic patients in the basement office of the house in which the parties lived. Kulstad primarily cared for the children on the weekends. The parties jointly participated in holding therapy with L.M. to address his reactive attachment issues.

¶15     Kulstad included Maniaci and the children in her will and as beneficiaries in her life insurance policies. Kulstad also claimed L.M. as a dependent on her tax returns for the years 2001 through 2006, and head of household status, with Maniaci's full knowledge and consent. Kulstad and Maniaci agreed that Maniaci would claim A.M. on her tax returns in 2004. Maniaci had not filed tax returns for the years 1999 through 2006 at the time this action had begun. Months later, Maniaci filed back tax returns for those years in which she sought to claim L.M. as a dependent.

¶16     Maniaci had her tax returns prepared for 2001, 2002, and 2003, in anticipation of adopting A.M. These tax returns contained inflated income figures. Maniaci provided these

6

inflated income figures to the Guatemalan government with A.M.'s adoption application. Maniaci never filed these tax returns with the Internal Revenue Service. Kulstad remained unaware of their existence until Maniaci produced them in response to Kulstad's discovery request in this case.

Property

¶17 Maniaci had purchased a 4.5 acre tract of land for $30,000 in July 1995. She paid approximately $43,214.73 for property improvements in 1995. Maniaci informed Kulstad and others, in early 1996, that she had no funds left to finish building the house. The parties understood that Kulstad would move to Montana and contribute her money and labor to help Maniaci complete construction of what would be their home. Kulstad contributed a portion of these monies from the sale of her house in Seattle to help fund the house in Montana.

¶18 Kulstad deposited her accumulated assets into the parties' joint checking account from 1996-2001. Kulstad began contributing money and labor to complete the construction of the house and improvements to the real property in the spring of 1996. Kulstad also constructed outbuildings and a play area for the children. Kulstad worked on the house and property nearly full-time during the spring and summer of 1996.

¶19 Kulstad expressed concern to Maniaci in the spring of 1996 that her name was not on the title. Maniaci assured Kulstad that the property would be divided equally should their relationship end. Kulstad relied on this assurance, as well as Maniaci's promise, that in the event of her death, Maniaci would bequeath the property to Kulstad. Maniaci executed a will in 1998 that left the real property to Kulstad.

¶20 Kulstad began working as her assets neared depletion. Kulstad's income failed to meet the financial needs of the parties. She used her credit cards to subsidize her income. Kulstad accrued debt for the benefit of the parties. She expended significant labor and money in helping Maniaci grow her chiropractic business. Kulstad worked to finish the basement office, entrance, deck, stairs, and trim. Kulstad's accrued debt included many items designed to facilitate Maniaci's chiropractic practice, such as paying the cost to finish the basement, purchasing Nikkei magnets, purchasing malpractice insurance, and purchasing chiropractic videos.

¶21 Maniaci initially agreed to help pay off the credit card debt. Maniaci's income from her chiropractic practice, however, did not increase as much as she had expected. Maniaci eventually received inheritance monies in the late summer of 2001. She refused to use this inheritance to help pay down the credit card debt in Kulstad's name. Maniaci instead deposited her inheritance monies into separate accounts that only she could access. Maniaci had filed for bankruptcy in 1992. Maniaci expected Kulstad to file for bankruptcy if she could not pay off the debt. Kulstad ultimately filed for bankruptcy in May 2002.

Prior Proceedings

¶22 Kulstad filed a petition to dissolve the parties' marriage and to receive a parenting interest on January 19, 2007. Kulstad sought a decree to dissolve the parties' common law marriage and to distribute equitably the parties' assets. Kulstad further sought an order of support of the minor children, an order granting her a parental interest, and an order implementing a parenting plan based on the best interests of the children. Kulstad also filed

8

for the appointment of a guardian ad litem (GAL). The court issued a summons to Maniaci and a temporary economic restraining order to the parties.

¶23 Maniaci filed a motion to dismiss Kulstad's petition for dissolution of marriage and parenting. She further objected to the appointment of a GAL. Maniaci also filed for a temporary restraining order (TRO) to prevent Kulstad from entering the family home.

¶24 The court denied Maniaci's motion to dismiss Kulstad's petition for parental interest and parenting plan. The court appointed a GAL and issued a TRO. The court initially reserved judgment on the legal recognition of the parties' relationship as a common law marriage. The court later rejected the dissolution portion of Kulstad's petition on the basis that Montana law does not recognize same-sex marriages.

¶25 The court held a hearing on March 20, 2007, to determine whether Kulstad had a parental interest in the minor children, whether Kulstad's relationship with the children warranted an interim parenting plan, and whether the TRO should remain in effect. Jane Cowley, GAL, attended on behalf of the children. The court heard testimony from the parties and numerous witnesses.

¶26 Kulstad presented several witnesses who testified regarding her relationship with the children, including L.M.'s teachers and a close family friend. The GAL submitted a seventeen page report that recommended that the court protect and encourage Kulstad's close relationship with the minor children. Doty Moquin (Moquin), a therapist who provided counseling to Maniaci and L.M., testified. Moquin relied upon her therapy sessions with

Maniaci in arguing that Kulstad did not have a child-parent relationship with the minor children.

¶27 The court found Moquin's testimony not credible. The court pointed to the contradictory testimony of other witnesses and the fact that Moquin had spoken to a limited number of people about Kulstad's relationship with the minor children. The court deemed Moquin's analysis insufficient to evaluate whether a child-parent relationship existed between Kulstad and the children. The court further cited the conflict created by Moquin's testimony in view of the fact that she served as a therapist for Maniaci and for L.M.

¶28 The court recognized that Maniaci legally had adopted the minor children. The court concluded, however, that Kulstad had established by clear and convincing evidence that a child-parent relationship existed between her and both of the minor children in accordance with § 40-4-211(4)(b) and (6), MCA. The court determined that an interim parenting plan served the children's best interests. The court further determined that § 40-4-228, MCA, applied to the final adjudication of parenting between the parties. The court allowed the TRO to remain in effect with the exception that Kulstad could return to the former family home for visitation exchanges.

¶29 The court revised the parenting plan on December 14, 2007. The court ordered the parties to participate in the Positive Alternative for Children Team (PACT) program. The court appointed Cindy Miller, Ph.D. (Dr. Miller), to complete a parenting plan evaluation. The court authorized Dr. Miller to arrange a substitute GAL upon the completion of the parenting plan evaluation following Maniaci's objection to Jane Cowley's continued service

10

as GAL. The court vested the GAL with authority to enforce the parenting plan. The court further allowed the GAL to recommend changes to the parenting plan, without a court order, based upon feedback from the parties' participation in the PACT program. The court also authorized Dr. Miller to select a therapist for both children. Dr. Miller selected Paul Silverman, Ph.D. (Dr. Silverman), to provide therapeutic services for the children and the parties.

Parenting

¶30    The court held a bench trial on May 22 and 23, 2008, to determine whether Kulstad should be awarded a permanent parental interest and whether the parties' property should be divided equitably. The parties again presented testimony, witnesses, and evidence. The court-appointed expert, Dr. Miller, presented testimony regarding her educational background and her parenting plan evaluation. Kulstad presented testimony by Dr. Silverman and Suzanne Dixon, M.D. (Dr. Dixon). Trayce Hansen, Ph.D. (Dr. Hansen), testified for Maniaci. The District Court entered a series of findings of fact based on the evidence presented at the trial. We highlight those findings here in narrative form.

¶31    Dr. Miller had practiced in the clinical psychology field for twenty-one years, including three years at Shodair Children's Hospital in Helena, Montana. Dr. Miller had been a member of the Missoula County Child Protection Team for ten years, and the Missoula County Child Abuse Referral and Evaluation Service Committee for six years. She had published her work in at least two major psychology and behavior journals.

11

¶32     Dr. Miller deemed both parties capable of being fit parents. Dr. Miller observed that the children had a strong attachment to both parties, consistent with the observation of the children's teachers and mental health professionals. Dr. Miller noted Maniaci's objection to the children's relationship with Kulstad. She contrasted Maniaci's objection with Kulstad's support of the children's relationship with Maniaci.

¶33     Dr. Miller also analyzed the children's developmental needs. She opined that both children had significant attachment issues. The children also had difficulty regulating themselves emotionally. Dr. Miller described this attribute as a skill learned in secure relationships. Dr. Miller noted that Kulstad had served as a psychological parent to the children before the parties' separation and that Kulstad continued to serve in that role after the separation. She offered that Kulstad's removal from their lives adversely would affect their future capacity to have stable, healthy relationships.

¶34     Dr. Miller also reviewed literature from the American Psychological Association (APA) regarding any effects on children of being raised in same-sex households. She asserted that a very strong consensus existed in the literature that showed no difference in children raised in same-sex households.

¶35     Dr. Silverman frequently conducts psychotherapy with the minor children individually, with the children and their parents, and with each adult separately. He started therapy with L.M. in April 2007 and with A.M. in September or October 2007. Dr. Silverman observed that both parties had parental relationships with the children. He

concluded that Kulstad had a relationship with the children before therapy. He could not specify precisely, however, when that relationship had begun.

¶36    Dr. Silverman determined that Kulstad comfortably had served in a parenting role from the beginning of his contact with her and that "she expresses great love for the children, caring, generally-appropriate parental behavior." Dr. Silverman believed it to be in the best interest of the children to maintain their relationship with Kulstad. Termination of the relationship would be detrimental to the children. He agreed with Dr. Miller's parenting plan evaluation.

¶37    Dr. Dixon testified on the relevance of parental sexual orientation to children's development. Dr. Dixon concluded that same-sex parents have no adverse impact on children's adjustment or well-being. Children of same-sex parents fare just as well as their peers physically, psychologically, emotionally, cognitively, and socially. This development includes a child's progression in gender and sexual development.

¶38    Dr. Hansen attacked the validity of Dr. Miller's parenting evaluation. Dr. Hansen argued that Dr. Miller had failed to use reliable and valid assessment measures and techniques. Dr. Hansen asserted that Dr. Miller's evaluation had failed to follow proper APA professional ethics guidelines. In particular, Dr. Hansen testified that the PACT program did not follow APA's guidelines for child custody evaluations. Dr. Hansen pointed to the fact that PACT was a new program and no professionals had studied its efficacy. Dr. Hansen argued that a published study of PACT would be needed before an objective evaluation could be made.

13

¶39    Dr. Miller, of course, had developed the PACT program. Dr. Miller conceded that she had modified the PACT program to fit the particular circumstances of this case. Dr. Hansen argued that this modification would require further study and evaluation once a proper review of the existing PACT program had been undertaken. Dr. Hansen testified that Dr. Miller's use and reliance on this modified version of the PACT program was "unethical" in light of psychologists' need to "substantiate their findings" and demonstrate that their findings "are reliable and valid."

¶40    Dr. Hansen argued that Dr. Miller initially should have followed the APA's recommendation to use established professional and scientific standards. As a result, Dr. Hansen criticized Dr. Miller's "own subjective clinical judgment opinion." Dr. Hansen also criticized Dr. Miller's assertion that the same-sex element in this case would have no effect on the children. She testified that Dr. Miller had failed to research the differences between children who are parented by same-sex couples and those who are parented by heterosexual couples.

¶41    Dr. Hansen admitted on cross-examination that parenting evaluations represented a new area for her and that she never actually had prepared one. Dr. Hansen never had been qualified as an expert witness by any court. Dr. Hansen never had been retained by any party as an expert witness. Dr. Hansen's psychology practice involved geriatric patients. Dr. Hansen conceded that she currently did not work with children and had fewer than four years of professional experience after earning her Ph.D. She had worked as a research assistant

14

and had published one article in the journal Personality Assessment in a forensic-type situation.

¶42 The court disagreed with Dr. Hansen's criticisms of Dr. Miller's parenting evaluation. Dr. Hansen's qualifications did not support her criticism of Dr. Miller's parenting evaluation or her testimony on the subject of the relevance of parental sexual orientation on children's development. The court concluded that Dr. Miller had prepared her evaluation by following the generally-accepted practices in the field. The court accepted and adopted Dr. Miller's parenting plan evaluation.

¶43 The court agreed with Dr. Miller and Dr. Silverman that both children had histories of significant abandonment and attachment issues. Kulstad represented a loving and stable force in the children's lives and that it would be in the best interests of the children to continue their child-parent relationship with Kulstad. The court found that Maniaci had presented no credible evidence to show that continuing the children's relationship with Kulstad would not be in their best interest. The court noted that, contrary to Dr. Hansen's testimony, the APA concludes that no evidence suggests that same-sex couples are unfit to be parents, or that psychosocial development among children of same-sex couples would be compromised in any respect.

¶44 The court determined that Maniaci and Kulstad had been domestic and financial partners with long-term commitments. Significant evidence established that the children regarded Kulstad as their parent. Maniaci claimed to have "lied" to the home study evaluators, Garthwait and Radtke, about her relationship with Kulstad. The court determined

15

that the evidence established, however, that the parties' relationship had been consistent with Maniaci's original representations to Garthwait and Radtke.

¶45 The parties' relationship placed the children into a family of same-sex parents. The court cautioned that the complexities of each child's attachment disorders mandated the court to proceed with care and follow the advice of Dr. Miller and Dr. Silverman. The court awarded Kulstad a parental interest in L.M. and A.M. The court further determined that Kulstad would have equal decision-making authority with Maniaci regarding significant matters affecting the children.

¶46 The court issued an interim parenting schedule. The court ordered the parties and minor children to participate in the PACT program for one year. The court directed that a GAL, selected through the PACT program, submit recommendations for a final parenting schedule after one year. The court would review the GAL's recommendations and issue a final parenting plan. The court authorized the GAL to recommend changes to the parenting schedule in consultation with Dr. Silverman, Dr. Miller, and Maniaci's PACT appointed therapist.

Property

¶47 Maniaci first asserted that Kulstad's contributions of money and labor to develop the real property represented nothing more than a gift. Maniaci next argued that Kulstad had intended for her contributions to the real property to serve as compensation for lodging. Maniaci finally claimed that Kulstad's work on the property had been defective, in need of repair, and had damaged the value of the real property.

16

¶48 Kulstad had contributed significant money and labor to maintain the real property. She thinned trees, performed home and yard maintenance, paid property taxes, paid the homeowner's insurance, and paid for garbage service. Kulstad's contributions of money and labor to improving and maintaining the real property from 1996 to 2006 had been significantly greater than Maniaci's contributions. Kulstad had undertaken her work on the property for the joint benefit of the parties and minor children with Maniaci's full knowledge and consent. The court thus determined that denying Kulstad any interest in the property unjustly would enrich Maniaci. The court awarded Kulstad $101,824.43 based upon Kulstad's contributions toward the parties' joint assets.

¶49 Kulstad had assumed primary responsibility for auto repairs and auto insurance for all vehicles regardless of how titled or used. Kulstad primarily drove the Kia Sportage. Maniaci primarily drove the Kia Sedona. The court awarded the Kia Sportage to Kulstad as an equitable award for her contributions of labor in improving the property. The court ordered the title to be transferred to Kulstad. The court allowed each party to retain all personal property then in her possession. Maniaci appeals.

**STANDARD OF REVIEW**

¶50 We review for correctness a district court's interpretation and application of statutes. *In re T.H.*, 2005 MT 237, ¶ 35, 328 Mont. 428, 121 P.3d 541. Questions of constitutionality involve a plenary review by this Court. *In re Custody and Parental Rights of D.S.*, 2005 MT 275, ¶ 15, 329 Mont. 180, 122 P.3d 1239.

17

¶51 We review a district court's findings of fact to determine whether the findings are clearly erroneous. *Fischer v. Fischer*, 2007 MT 101, ¶ 8, 337 Mont. 122, 157 P.3d 682. We will affirm the district court's decision when substantial credible evidence supports the findings, unless there has been a clear abuse of discretion. *Toavs v. Buls*, 2006 MT 68, ¶ 7, 331 Mont. 437, 133 P.3d 202.

¶52 We view the evidence in the light most favorable to the prevailing party. *In re Estate of Bradshaw*, 2001 MT 92, ¶ 11, 305 Mont. 178, 24 P.3d 211. The trial court determines the credibility of witnesses and the weight assigned to their respective testimony. *In re Bradshaw*, ¶ 11. We do not consider whether evidence supports findings that are different from those made by the district court. We confine our review to the determination of whether substantial credible evidence supports the findings actually made by the district court. *In re Bradshaw*, ¶ 11.

## DISCUSSION

¶53 *Whether the court's application of §§ 40-4-211 and 40-4-228, MCA, to support Kulstad's claim of a parental interest violates Maniaci's fundamental constitutional rights as a parent.*

¶54 Maniaci contends that she stands as the fit natural parent to the minor children after the adoption process had severed the parenting rights of the children's biological parents. Maniaci argues that § 40-4-228, MCA, improperly fails to require a court to determine the "fitness" of a natural parent before awarding a nonparent a parental interest based upon the best interests of the child. Maniaci further argues that her adopted children have no

18

constitutionally protected rights, absent a showing of abuse, neglect, or dependency. She points to a series of decisions by this Court to support her claim that this Court continually has upheld the constitutionally protected rights of the natural parent over a third party.

Pre-1999 Decisions

¶55 In the first case, the Court in *Matter of Guardianship of Doney*, 174 Mont. 282, 570 P.2d 575 (1977), returned the children to the biological father even though the biological father had given their aunt temporary custody after the children's mother had died. In *In re A.R.A.*, 277 Mont. 66, 919 P.2d 388 (1996), the Court awarded custody to the absent biological father after the child's mother died and the step-father had sought custody in favor of the biological father. Finally, the Court in *Girard v. Williams*, 1998 MT 231, 291 Mont. 49, 966 P.2d 1155, awarded custody to the biological father. The step-father had cared for the children after the mother had been murdered and after the biological father had been incarcerated. *Girard*, ¶¶ 3-5, 9. The step-father later died and his brother and wife assumed care of the children. *Girard*, ¶ 13. The court rejected the attempt by the brother and wife of the step-father to obtain legal custody to the exclusion of the biological father. *Girard*, ¶ 57. Maniaci argues that these cases establish that the Court has not recognized the "best interests of the child" standard absent a showing of abuse, neglect, or dependency.

¶56 A third party in each of these cases attempted to secure custody of the minor children to the exclusion of the biological parent. The parties, in essence, sought to terminate the parental rights of the biological parent based upon the best interests of the child. More importantly, these cases predate the 1999 amendments. The pre-1999 statutes made

termination of parental rights, based upon dependency, abuse, or neglect, the only option available to the Court before it could award a nonparent a custodial interest. *Doney*, 174 Mont. at 286, 570 P.2d at 577; *In re A.R.A.*, 277 Mont. at 72, 919 P.2d at 392; *Girard*, ¶ 47.

1999 Amendments

¶57 The 1999 Montana legislature amended the nonparental statutes to recognize specifically a child's constitutional rights in nonparental parenting proceedings. The legislature added § 40-4-228, MCA, which provides that "when a nonparent seeks a parental interest in a child under 40-4-211 or visitation with a child, the provisions of this chapter apply unless a separate action is pending under Title 41, chapter 3." Section 40-4-211(4)(b), MCA, allows a nonparent standing to seek a parenting interest of a minor child if the person has established a child-parent relationship.

¶58 Nothing in Section 40-4-228, MCA, limits its application to a finding of abuse or neglect. Section 40-4-228(2)(b), MCA, specifically provides that a party seeking a parental interest first *must* establish a child-parent relationship. The legislature also added § 40-4-227(1)(a), MCA, which defers to the rights of the natural parent. Section 40-4-227(1)(a), MCA, provides that "it is the policy of the state of Montana to recognize the constitutionally protected rights of parents and the integrity of the family unit." The statute seeks to balance the parent's rights with the constitutionally protected rights of the child to determine the best interests of the child. Section 40-4-227(1)(a)-(c), MCA. The parent's constitutionally protected interest in the parental control of a child should yield to the best interests of the

20

child "when the parent's conduct is contrary to the child-parent relationship." Section 40-4-227(2)(b), MCA.

¶59 Statutes carry a presumption of constitutionality. *In re Custody and Parental Rights of D.S.*, 2005 MT 275, ¶ 15, 329 Mont. 180, 122 P.3d 1239. The party challenging the statute carries the burden of proving the statute's unconstitutionality beyond a reasonable doubt. *In re Custody and Parenting Rights of D.S.*, ¶ 15. We resolve any doubt in favor of the statute. *State v. Michaud*, 2008 MT 88, ¶ 15, 342 Mont. 244, 180 P.3d 636.

¶60 Maniaci argues that *In re Parenting of J.N.P.*, 2001 MT 120, 305 Mont. 351, 27 P.3d 953, decided two years after the 1999 amendments, implicitly rejected their constitutionality. We disagree. In *J.N.P.*, Tammy Lynn Knopp (Tammy), a natural mother, left her child temporarily with her aunt and uncle (Knopps) to allow her to find employment and a place to live. The uncle prepared a document entitled "temporary guardianship." *J.N.P.*, ¶¶ 5-6. The document purported to authorize the Knopps to seek medical attention for J.N.P. if it became necessary. Tammy signed the document. *J.N.P.*, ¶ 5.

¶61 The Knopps filed a petition for a parenting plan and child support for J.N.P. after caring for her for slightly more than two months. *J.N.P.*, ¶ 6. The petition actually sought designation of the Knopps as custodian of the child, sought an order that the child reside with Knopps, and sought to limit Tammy to restricted and supervised visitation. *J.N.P.*, ¶ 6. As noted by the Court, "the Knopps' petition was the functional equivalent of a petition for custody of J.N.P." *J.N.P.*, ¶ 6. The Knopps also applied for temporary custody on an *ex parte* basis. The court granted their request. *J.N.P.*, ¶ 7.

21

¶62    Tammy moved to terminate the guardianship and restore her parental rights. *J.N.P.*, ¶ 8. She argued that her parental rights could not be terminated absent a Title 41 proceeding. *J.N.P.*, ¶ 9. Although the Knopps relied upon the "best interest" standard in § 40-4-212, MCA, they sought actual custody of J.N.P., as opposed to a parental interest. *J.N.P.*, ¶¶ 6, 10. The court concluded that the law does not permit the destruction of a natural parent's fundamental right to custody of her child based solely upon the child's best interest. *J.N.P.*, ¶ 26.

¶63    Maniaci contends that the Court must have assumed the existence of a child-parent relationship in *J.N.P.* because Tammy had left the child in the Knopps's exclusive custody. The Knopps could not rely upon the nonparental statutes in seeking custody of J.N.P., however, in light of their failure to comply with the statutory pre-requisites of first establishing a child-parent relationship through a petition filed under § 40-4-211, MCA. *In re Parenting of D.A.H.*, 2005 MT 68, ¶ 9, 326 Mont. 296, 109 P.3d 247. The Court in *D.A.H.* refused to allow grandparents seeking custody to sidestep this statutory pre-requisite and the Court in *J.N.P.* also refused. *J.N.P.*, ¶¶ 22-23. The Court determined that it could not deny Tammy custody absent termination of her parental rights pursuant to a Title 41 proceeding. *J.N.P.*, ¶ 25.

*Troxel* Standard

¶64    Maniaci further claims that the United States Supreme Court rejected a similar statutory scheme in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054 (2000). In *Troxel*, two children were born to a couple out of wedlock. *Troxel*, 530 U.S. at 60, 120 S. Ct. at 2057.

The children's parents separated and their father lived with his parents, Jenifer and Gary Troxel (Troxels). The Troxels' son regularly brought their grandchildren to the Troxels' home for weekend visitation. *Troxel*, 530 U.S. at 60, 120 S. Ct. at 2057.

¶65    Tommie Granville (Granville), the children's mother, limited the Troxels' visitation after the suicide death of the Troxel's son. *Troxel*, 530 U.S. at 60-61, 120 S. Ct. at 2057. The Troxels petitioned for the right to visit their grandchildren under the Washington statute that provided "any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances." *Troxel*, 530 U.S. at 61, 120 S. Ct. at 2057-58. The trial court determined that visitation served the children's best interests. *Troxel*, 530 U.S. at 61, 120 S. Ct. at 2058.

¶66    The Washington Court of Appeals reversed. *Troxel*, 530 U.S. at 62, 120 S. Ct. at 2058. It viewed limits on nonparental visitation as being "consistent with the constitutional restrictions on state interference with parents' fundamental liberty interest in the care, custody, and management of their children." *Troxel*, 530 U.S. at 62, 120 S. Ct. at 2058. The Washington Supreme Court agreed that the statute unconstitutionally infringed on the fundamental rights of parents to rear their children. *Troxel*, 530 U.S. at 63, 120 S. Ct. at 2058.

¶67    The Washington court found two major problems with the statute. The court noted first that the State may interfere in the right of parents to rear their children only to prevent

23

harm or potential harm to the child. The court further noted that the statute sweeps too broadly by allowing "any person" to petition for forced visitation at "any time" with the only requirement being to serve "the best interest of the child." *Troxel*, 530 U.S. at 63, 120 S. Ct. at 2058-59. The court rejected the notion that the State should be making significant custody decisions "merely because it could make a 'better' decision." *Troxel*, 530 U.S. at 63, 120 S. Ct. at 2059. The court cited in this regard the fact that the trial court had given no special weight to Granville's determination of her daughters' best interests. *Troxel*, 530 U.S. at 69, 120 S. Ct. at 2062. The United States Supreme Court granted certiorari and affirmed the judgment. *Troxel*, 530 U.S. at 63, 120 S. Ct. at 2059.

¶68 Maniaci argues that this Court embraced *Troxel* in *Polasek v. Omura*, 2006 MT 103, 332 Mont. 157, 136 P.3d 519, and thereby rendered unconstitutional the 1999 amendments to the nonparental statutory framework set forth in §§ 40-4-211 and 40-4-228, MCA. In *Polasek*, this Court determined that the *Troxel* plurality opinion remained consistent with our "best interest of the child" standard contained in § 40-9-102, MCA. *Polasek*, ¶ 14. Section 40-9-102, MCA, allows a grandparent reasonable rights to contact with a child. The Court reasoned that *Troxel* instructs, and our statute requires, a court to determine the fitness of an objecting parent whose parental rights have not been terminated before a court may grant a petition for grandparent contact. *Polasek*, ¶ 15; § 40-9-102(2), MCA. A presumption arises in favor of the parent's wishes if the parent is fit. *Polasek*, ¶ 15.

¶69 Maniaci seeks to have this Court extend the parental fitness condition of the grandparent contact statute to §§ 40-4-211 and 40-4-228, MCA. The extension advocated by

24

Maniaci would ignore the different language in the grandparent contact statute and the nonparenting statutes. Section 40-4-228(5), MCA, provides that "it is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party." The Supreme Court in *Troxel* passed on the constitutional question as to whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. *Troxel*, 530 U.S. at 73, 120 S. Ct. at 2064. The Court recognized that most state adjudication in the visitation context occurs on a case-by-case basis. As a result, the Court announced that it "would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." *Troxel*, 530 U.S. at 73, 120 S. Ct. at 2064.

¶70    The Washington visitation statute at issue in *Troxel* allowed *anyone* to be awarded visitation. *Troxel*, 530 U.S. at 61, 120 S. Ct. at 2057. Section 40-4-228(2)(b), MCA, provides that a party first *must* establish a child-parent relationship. Section 40-4-211(4)(b), MCA, authorizes a court to consider visitation only once the party has established a child-parent relationship. Moreover, the 1999 amendments require the court to balance the constitutionally protected rights of both the parents and children in determining the best interests of the child. Section 40-4-227, MCA.

¶71    The Minnesota Supreme Court upheld the constitutionality of a nonparenting statute in *SooHoo v. Johnson*, 731 N.W.2d 815 (Minn. 2007), similar to the one enacted by the Montana legislature. The Minnesota statute limited the class of people who could petition for visitation to those persons who had resided with the child for two years or more and it

25

further narrowed the class of those who could be awarded visitation to parties who had "established emotional ties creating a parent and child relationship." *SooHoo*, 731 N.W.2d at 820. Montana's nonparental statutes avoid constitutional infirmity under the *Troxel* standard through the twin thresholds of consideration of the wishes of the natural parent and the need to first establish a child-parent relationship. *See also Rubano v. DiCenzo*, 759 A.2d 959 (R.I. 2000).

¶72 Maniaci argues that courts in other jurisdictions have applied the *Troxel* standard in reversing decisions of trial courts in allowing visitation or custody rights to a third party. For example, in *Janice M. v. Margaret K.*, 404 Md. 661, 948 A.2d 73 (Md. 2008), Maryland's highest appellate court rejected the common law de facto parent doctrine as a basis for awarding visitation rights to a third party. Maryland had no statute similar to Montana's nonparenting statute, however, that would provide the basis for allowing the visitation. The court cautioned that "[w]hether the Maryland General Assembly chooses to enact legislation similar to the Minnesota statute at issue in *SooHoo* is within its prerogative." *Janice M.*, 404 Md. at 689, 948 A.2d at 89. Montana's legislature has chosen to enact the nonparenting statutes. Maniaci has failed to carry her burden of proving beyond a reasonable doubt that the statutes she challenges impermissibly infringe on her constitutional right to parent her children. *In re Custody and Parenting Rights of D.S.*, ¶ 15.

¶73 *Whether the court properly awarded Kulstad a parental interest*.

¶74 The nonparental statutory framework allows a court to award a parental interest to a nonparent who establishes two threshold conditions by clear and convincing evidence.

26

These threshold conditions are that: "(a) the natural parent has engaged in conduct that is contrary to the child-parent relationship; and (b) the nonparent has established with the child a child-parent relationship as defined in 40-4-211, and it is in the best interests of the child to continue that relationship." Section 40-4-228(2)(a)-(b), MCA. Maniaci contends that Kulstad failed to prove by clear and convincing evidence the mandatory requirements of § 40-4-228(2)(a)-(b), MCA.

Conduct Contrary to Child-Parent Relationship

¶75   Maniaci claims that Kulstad failed to demonstrate that Maniaci had engaged in conduct contrary to the child-parent relationship. Maniaci argues that nonparenting statutes limit conduct contrary to the child-parent relationship to instances of abuse or neglect. The State never initiated any abuse or neglect proceedings against Maniaci and Kulstad never made any allegations of abuse or neglect. Section 40-4-228(5), MCA, specifically provides, however, that it "is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party under this section." Nothing in § 40-4-228, MCA, limits its application to cases of abuse or neglect.

¶76   The District Court determined that Maniaci had acted contrary to her child-parent relationship when she ceded her exclusive parenting authority to Kulstad. Kulstad functioned in a parental role from the first day that L.M. came to the parties in 2001 through the end of the parties' relationship. Kulstad similarly functioned in a parental role from the first day that A.M. came to the parties in 2003 through the end of the parties' relationship. Maniaci repeatedly represented to the home study evaluators, and, in turn, to adoption

27

authorities that she and Kulstad would raise the minor children as a family unit. Maniaci also depicted this same familial environment to the Human Rights Campaign as part of her effort to adopt A.M. The court specifically found that the parties' relationship placed the children into a family of same-sex parents.

¶77 Maniaci's testimony that she had "lied" to the home study evaluators and adoption authorities proves unavailing. We recently rejected similar claims by parties seeking to disavow earlier representations made regarding the status of a party's economic or personal relationship. *LeFeber v. Johnson*, 2009 MT 188, 351 Mont. 75, 209 P.3d 254, and *In re Marriage of Swanner-Renner*, 2009 MT 186, 351 Mont. 62, 209 P.3d 238. LeFeber argued that Johnson had been acting as his nominee in purchasing a house and therefore was not entitled to any ownership interest in the house at the end of the parties twenty-year relationship. The district court rejected this claim, in large part, because LeFeber had "overtly engaged in act[s] wholly inconsistent with [Johnson's] role as an agent or nominee holding bare legal title to the St. Joseph property." *LeFeber*, ¶ 28. LeFeber had represented to the Montana Department of Revenue "for seven years running" that Johnson was the sole legal owner of the property. *LeFeber*, ¶ 28. And LeFeber had assured Johnson in a 1999 letter that she had "rights" to the property. *LeFeber*, ¶ 28. In *Swanner-Renner*, Renner attempted to refute Swanner's claim of a common law marriage between them by arguing that he never had intended to enter a marriage during their twelve-year relationship. Numerous earlier claims to the contrary complicated his attempted refutation. Renner had filed several federal tax returns indicating that his status was married, filing separately.

*Swanner-Renner*, ¶ 15. Renner had identified Swanner as his wife in sworn deposition testimony in another case in Montana in 1999. *Swanner-Renner*, ¶ 15. Renner also had executed several documents for purposes of obtaining benefits from his union in which he represented that Swanner was his wife. *Swanner-Renner*, ¶ 15.

¶78 Maniaci represented to home study evaluators and adoption authorities that she and Kulstad would serve as parents to the children. Maniaci relied upon Kulstad's support of the children's physical, psychological, and developmental needs. Maniaci further relied upon Kulstad's financial wherewithal to present a more stable financial picture to adoption authorities. And Kulstad, with Maniaci's full knowledge and consent, claimed L.M. as a dependent on her tax returns. Kulstad and Maniaci received a financial benefit from this representation to the Internal Revenue Service. Maniaci cannot rewrite the history of the fact that she and Kulstad lived together for more than 10 years and jointly raised the minor children in the same household. The District Court has discretionary authority to determine that a parent acted contrary to her child-parent relationship when substantial credible evidence supports its findings. *Toavs*, ¶ 7. Substantial credible evidence in the record supports the District Court's determination that Maniaci repeatedly and continually acted contrary to her child-parent relationship.

In Loco Parentis

¶79 Section 40-4-211(6), MCA, provides that a "child-parent relationship" includes a relationship that existed, in whole or in part, before the filing of a parenting plan action. The party seeking to establish this relationship first must demonstrate that she provided for the

29

physical needs of the child by supplying food, shelter, and clothing. Section 40-4-211(6), MCA. The party further must demonstrate that she provided the child with the necessary care, education, and discipline on a day-to-day basis "through interaction, companionship, interplay, and mutuality that fulfill the child's psychological needs for a parent as well as the child's physical needs." Section 40-4-211(6), MCA.

¶80 The District Court determined that Kulstad had met these criteria through the fact that Maniaci "consented to and fostered the parent-like relationship between Ms. Kulstad and the children." The court pointed specifically to the facts that Kulstad and the children lived together in the same household and that Kulstad had participated without restriction in their daily lives as a co-parent. The court further noted that Kulstad had assumed significant financial obligations of parenthood without expectation of financial compensation. Finally, the court found that Kulstad had served in this parental role for a sufficient length of time to have established with the children "a bonded, dependent relationship parental in nature."

¶81 Maniaci contends that Kulstad had to demonstrate that Maniaci voluntarily had permitted her children to remain continuously in the exclusive care of Kulstad for a significant period of time in order for Kulstad to have established a child-parent relationship. Maniaci argues, in fact, that Kulstad needed to demonstrate that she stood in loco parentis to Maniaci's children to satisfy the requirement of § 40-4-228(4), MCA. Maniaci argues that this Court consistently has interpreted in loco parentis to mean a person who acts as a parent to the exclusion of the natural parent.

¶82 Maniaci argues that Kulstad's failure to demonstrate that she "stood in place of" Maniaci as parent to the minor children renders irrelevant the question of whether Kulstad had established a child-parent relationship. Maniaci cites to *Peterson v. Kabrich*, 213 Mont. 401, 691 P.2d 1360 (1984), and *Niemen v. Howell*, 234 Mont. 471, 764 P.2d 854 (1988), to support her claim that this Court has recognized in loco parentis status only when a party stands in place of the natural parent. Both cases focus on whether monetary transfers between adult relatives should be treated as gifts or loans. Both cases discuss in loco parentis status only incidentally to the main analysis. And neither case restricts in loco parentis status to a nonparent serving as a parent to a child to the exclusion of the natural parent.

¶83 The widow of the adult nephew in *Peterson* claimed that certain monetary transfers made by the aunt to the adult nephew had been gifts and thus should not be subject to repayment. The widow claimed that an in loco parentis status existed between the aunt and her adult nephew in order to support a presumption that the aunt had intended the transfers to be gifts. The Court rejected this claim where the evidence indicated that the relationship had been limited "to occasional visits and the exchange of letters and Christmas gifts." *Peterson*, 213 Mont. at 408, 691 P.2d at 1364. The Court noted that in order to stand in loco parentis to another, "a person must intentionally assume the status of a parent by accepting those responsibilities and obligations incident to the parental relationship without benefit of legal adoption." *Peterson*, 213 Mont. at 408, 691 P.2d at 1364. The Court made no mention of whether the acceptance of these responsibilities and obligations must be to the exclusion of a

natural parent. In any event, the aunt had not accepted those responsibilities and obligations through the exchange of letters and Christmas cards and hosting the adult nephew on occasional visits.

¶84   Similarly, in *Niemen*, a surviving widow claimed that the step-father of her deceased husband had assumed in loco parentis status as part of her effort to avoid repaying substantial amounts of money advanced by the step-father. The widow argued that the step-father had "accepted responsibilities and obligations incident to the parental relationship." *Niemen*, 234 Mont. at 475, 764 P.2d at 856. The Court rejected this claim on the grounds that "no evidence in the record [ ] establishes this fact." *Niemen*, 234 Mont. at 475, 764 P.2d at 856. The Court cited the "close and loving relationship" between the step-father and the adult child as a reason for the step-father advancing payments to the adult son, including gifts and loans, but concluded that the evidence failed to establish that the step-father had assumed the role of parent for the adult child. *Niemen*, 234 Mont. at 475, 764 P.2d at 856. We rejected a similar claim of in loco parentis status between a decedent and adult claiming to have been adopted as an adult in *In re Estate of Bovey*, 2006 MT 46, ¶ 18, 331 Mont. 254, 132 P.3d 510.

¶85   Here Kulstad and Maniaci served as parents for young children entirely dependent on them for their care and well being. The District Court entered findings that established that Kulstad had accepted responsibilities and obligations incident to the parental relationship. Maniaci argues nevertheless that § 40-4-228(4), MCA, limits in loco parentis status to a situation where the natural parent steps aside and allows another person to remain

continuously in the care of another for a significant period of time to the exclusion of the natural parent.

¶86 We note first that § 40-4-228(4), MCA, provides merely one example of how a natural parent's conduct may be contrary to the child-parent relationship. Nothing in § 40-4-228(4), MCA, makes any mention of the requirement that the person acting in loco parentis does so to the exclusion of the natural parent. None of the decisions of this Court have defined in loco parentis status to require a third party acting as a parent to the exclusion of the natural parent. We decline to read this requirement into § 40-4-228(4), MCA.

¶87 The District Court also relied in part on the common law doctrine of de facto parenting to support its conclusion that Kulstad had standing to commence this proceeding. We need not rely upon the de facto parenting doctrine in light of the legislature's decision to amend the parenting statutes to allow for a parental interest to be awarded to a party who could establish a child-parent relationship with the child when the natural parent had engaged in conduct contrary to the child-parent relationship. Section 40-4-228(2)(a)-(b), MCA. The District Court found that continuing Kulstad's relationship with the minor children would be in the children's best interests and substantial evidence in the record supports the District Court's finding.

Clear and Convincing Evidence of Child-Parent Relationship

¶88 Maniaci further contends that, even assuming for the sake of argument that Kulstad stood in loco parentis to the minor children, Kulstad still failed to prove by clear and convincing evidence that she had established a child-parent relationship. Maniaci argues that

33

§ 40-4-211(6), MCA, required Kulstad to have provided for the physical and psychological needs of the children before she filed the lawsuit. Maniaci urges the Court to look at the alleged relationship between Kulstad and the children *before* Kulstad commenced this action.

¶89 Maniaci disparages as self-serving Kulstad's testimony regarding the history of her child-parent relationship. Maniaci claims that Dr. Silverman "could only attribute some semblance of a relationship" between Kulstad and the children "as far back as six months before [Kulstad] filed her lawsuit – a time when litigation was imminent, and after the time that [Kulstad] attempted to get Dr. Maniaci to enter into a written agreement about custody." Maniaci further argues that only she brought forward witnesses who could attest to the nature of Kulstad's relationship with the children.

¶90 A district court sits in the best position to observe and judge witness credibility and we will not second guess its determination regarding the strength and weight of conflicting testimony. *In re Marriage of Horton*, 2004 MT 353, ¶ 19, 324 Mont. 382, 102 P.3d 1276. The District Court received and heard testimony from numerous witnesses, including mental health professionals, the children's therapists, and the court appointed GAL. This evidence and testimony allowed it to determine that Kulstad had established a child-parent relationship with the minor children. This evidence and testimony further allowed the court to evaluate whether it was in the children's best interest to maintain that child-parent relationship.

¶91 The court acknowledged that the adoption allowed Maniaci to be the exclusive legal parent. The court recognized, however, that Maniaci's actions from the time that the children entered the home had been entirely inconsistent with an exclusive child-parent

34

relationship. Kulstad, with Maniaci's consent, served in a parental role for a length of time sufficient to establish a bonded, dependent relationship with the minor children. Kulstad functioned in a parental role from the first day that each of the minor children came to the parties through the end of the parties' relationship. Dr. Silverman testified that the children and Kulstad had established and maintained a child-parent relationship. Dr. Silverman and Dr. Miller testified that the children would suffer irreparable harm should the court deny parenting time to Kulstad. The record supports the court's decision to award Kulstad a parental interest in the minor children. *In re Bradshaw*, ¶ 11.

¶92    *Whether the court properly awarded Kulstad personal property and a property interest in the parties' home.*

¶93    The court applied equitable principles in dividing the personal and real property between the parties. We have approved a district court's application of equitable doctrines in dividing the property of unmarried cohabitants in *Anderson v. Woodward,* 2009 MT 144, 350 Mont. 343, 207 P.3d 329, and *LeFeber*.

¶94    We determined in *Anderson* that the district court correctly had applied equitable principles to distribute two real estate properties that the parties had accumulated during their eight-year relationship. *Anderson*, ¶ 16. The district court in *LeFeber* properly used equitable doctrines to divide property that LeFeber had purchased and Johnson had improved. *LeFeber*, ¶ 23. Johnson's improvements included finishing the basement, building a deck, installing flooring, fencing the yard, constructing a greenhouse, and installing almost all of the landscaping on the property. *LeFeber*, ¶ 14. The district court

35

had the power to make compensatory adjustments between the respective parties "according to the ordinary principles of equity." *LeFeber*, ¶ 21; *Anderson*, ¶ 16. We described the approach used to divide the property as being "similar to that used to divide a marital estate in a dissolution action." *LeFeber*, ¶ 22. We also noted that the court "has great flexibility in fashioning appropriate relief for the parties." *LeFeber*, ¶ 22.

¶95　Similarly in *Flood v. Kalinyaprak*, 2004 MT 15, ¶¶ 26-27, 319 Mont. 280, 84 P.3d 27, the district court correctly applied equitable doctrines in dividing the assets of an unmarried couple. In *Flood*, the unmarried couple disputed the distribution of property that they had acquired during their relationship. *Flood*, ¶¶ 10-11. Flood instituted a partition action after the relationship had ended and brought additional claims, including unjust enrichment and constructive trust. *Flood*, ¶ 11.

¶96　Maniaci purchased the real property and paid for the initial property improvements. Kulstad contributed her money and labor to complete the construction of the house and improvements to the real property. The court determined that Kulstad's testimony and evidence entitled her to an equitable and fair award of $101,824.43. The court also allowed an equitable award of the Kia Sportage automobile for Kulstad's significant contributions of labor in improving the property. The District Court properly used equitable doctrines to divide the parties' personal and real property. *LeFeber*, ¶ 23; *Anderson*, ¶ 16; *Flood*, ¶¶ 26-27. The District Court had "great flexibility" in fashioning appropriate relief for Kulstad and Maniaci using the ordinary principles of equity. *LeFeber*, ¶ 23; *Anderson*, ¶ 16; *Flood*, ¶ 20.

¶97　Affirmed.

36

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER


Justice James C. Nelson, concurring.

¶98 I concur.

¶99 Maniaci and her defense team[1] attempt to avoid the one issue that makes this case uniquely important—the elephant in the room: whether homosexuals in an intimate domestic relationship each have the right to parent the children they mutually agree that one party will adopt (or, presumably, conceive).[2] The District Court and this Court have properly answered that question in the affirmative based on the facts of this case and on the statutory scheme discussed. I agree with the District Court's decision, and I concur with this Court's decision.

¶100 Sadly, however, this case represents yet another instance in which fellow Montanans, who happen to be lesbian or gay, are forced to battle for their fundamental rights to love

---

[1] Alliance Defense Fund (counsel), and Montana Family Foundation and Pacific Justice Institute (amici curiae).

[2] I say they "attempt" to avoid this issue because each of the defense team's participants makes a point of disavowing sexual orientation as playing any part in their involvement in this case—a point that (a) would not need to be raised if sexual orientation

who they want, to form intimate associations, to form family relationships, and to have and raise children—all elemental, natural rights that are accorded, presumptively and without thought or hesitation, to heterosexuals.

¶101 The Court's decision is grounded in the statutory scheme which was raised and argued. I remain absolutely convinced, nonetheless, that homosexuals are entitled to enjoy precisely the same civil and natural rights as heterosexuals as a matter of constitutional law. I wrote extensively on this and on the discrimination homosexuals face daily in my special concurrence in *Snetsinger v. Montana University System*, 2004 MT 390, ¶¶ 38-111, 325 Mont. 148, 104 P.3d 445 (Nelson, J., specially concurring). I argued that this Court should recognize: (a) that laws and policies which deny people their fundamental rights on the basis of gender or sexual orientation violate the inviolable human dignity clause of Article II, Section 4 of the Montana Constitution; (b) that classifications of persons on the basis of gender or sexual orientation are sex-based and are, therefore, arbitrary and suspect under conventional equal protection analysis; and (c) reading Article II, Sections 4 and 34 together (which I believe is the better approach), that classifications based on gender or sexual orientation are suspect classifications in their own right and are in addition to those enumerated in the third clause of this State's equal protection provision. *See Snetsinger*, ¶¶ 71-97 (Nelson, J., specially concurring).

---

were, indeed, not implicitly at issue here and (b) is belied by each of these participants' foundational beliefs opposing homosexuality.

¶102　I stand by my concurring opinion. Unfortunately, though, nothing has changed. I am convinced that until our courts, as a matter of law, accept homosexuals as equal participants with heterosexuals in our society, each person with exactly the same civil and natural rights, lesbian and gay citizens will continue to suffer homophobic discrimination. Regrettably, this sort of discrimination is both socially acceptable and politically popular.

¶103　Naming it for the evil it is, discrimination on the basis of sexual orientation is an expression of bigotry. And, whether rationalized on the basis of majoritarian morality, partisan ideology, or religious tenets, homophobic discrimination is still bigotry. It cannot be justified; it cannot be legalized; it cannot be constitutionalized.

¶104　Every person in Montana is entitled to human dignity; every person in Montana is entitled to individual privacy; and every person in Montana is entitled to seek happiness in all lawful ways. These are fundamental rights guaranteed, respectively, by Article II, Sections 4, 10, and 3 of the Montana Constitution, and no person may be denied these elemental, natural rights because of his or her sexual orientation. Indeed, while it will, no doubt, come as a shock to some, the fact is that lesbian and gay people are not excepted out of the protections afforded by the Montana Constitution. Lesbian and gay Montanans must not be forced to fight to marry, to raise their children, and to live with the same dignity that is accorded heterosexuals. That lesbian and gay people still must fight for their fundamental rights is antithetical to the core values of Article II and speaks, in unfortunate clarity, of a prevalent societal cancer grounded in bigotry and hate.

¶105　I concur in the Court's Opinion.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶106 Today the Court retreats from its clear declaration of the fundamental constitutional rights of parents. In exchange, the Court adopts an equitable, case-by-case inquiry to determine if a third party should be granted a parental interest of a child that must be balanced against a natural parent's rights. The Court's decision will open a Pandora's Box of potential attacks upon the right of fit and capable parents to raise their own children. I dissent from this weakening of parental constitutional rights.

### *A Parent's Constitutional Rights*

¶107 We have previously recognized "the constitutional rights of a natural parent to parent his or her child," explaining that this right requires "careful protection" and is "not merely a matter of legislative grace, but is constitutionally required." *In re A.R.A.*, 277 Mont. 66, 70, 919 P.2d 388, 391 (1996). This Court has explained that there are few invasions "into the privacy of the individual that are more extreme than that of depriving a natural parent of the custody of his children." *In re Guardianship of Doney*, 174 Mont. 282, 285, 570 P.2d 575, 577 (1977). Consequently, we have protected parents against claims adverse to these constitutional rights by repeatedly holding that "a natural parent cannot be denied custody of his or her child *absent termination of that person's parental rights for abuse or neglect . . . .*" *In re Parenting of J.N.P*, 2001 MT 120, ¶ 25, 305 Mont. 351, 27 P.3d 953 (emphasis added).

40

We have erected high legal barriers to protect parents from claims of third parties, holding that a "finding of abuse, neglect, or dependency is the *jurisdictional prerequisite* for any court-ordered transfer of custody from a natural parent to a third party." *J.N.P.*, ¶ 18 (citation omitted, emphasis added). Even when considering a minimally invasive claim—the mere visitation of a child by the child's grandparents—we have rejected on constitutional grounds the failure to recognize the wishes of a fit parent. *Polasek v. Omura*, 2006 MT 103, ¶¶ 15-17, 332 Mont. 157, 136 P.3d 519 ("[P]arents have a fundamental constitutional right to make decisions concerning the care, custody, and control of their children." (citations and quotations omitted)).

¶108   However, the Court denies to Maniaci the constitutional protections promised to her in our previous holdings by removing the "jurisdictional prerequisite," which has protected parents against the claims of third parties, and thereby opens wide the door to such claims— not only against Maniaci, but potentially against all parents. Now, even parents who are fit and capable, like Maniaci, are potentially subject to the claims of third parties for rights to their children.

¶109   In reaching this conclusion, the Court misstates or misunderstands our previous constitutional holdings and offers what I believe are faulty grounds to distinguish those cases, for the apparent purpose of diminishing the reach of the constitutional rights previously declared for parents. About our pre-1999 decisions, the Court offers that the "pre-1999 *statutes* made termination of parental rights, based upon dependency, abuse, or neglect, the only option available to the Court before it could award a nonparent a custodial

41

interest," citing *A.R.A.* in support. Opinion, ¶ 56 (emphasis added). To the contrary, it was not the statutes that limited third party claims against parents in those cases, but the constitutional rights of parents. *A.R.A.* held that a pre-1999 statute was unconstitutional for the very reason that it *permitted* a third party to be awarded a custodial right before the parents' rights had been terminated. *A.R.A.*, 277 Mont. at 72, 919 P.2d at 392 ("[Section] 40-4-221, MCA, is unconstitutional to the extent that it allows the granting of a § -221 petition prior to the termination of the natural parent's constitutional rights."). As we stated when striking down a subsequent statute in *J.N.P.*, "*A.R.A.* [was] based on *constitutional considerations.*" *J.N.P.*, ¶ 20 (emphasis added). Contrary to the Court's analysis, it was not the pre-1999 statutes that limited the claims of third parties, but the Montana Constitution.

¶110 The Court similarly displaces the holding of our 2001 decision of *J.N.P.*, stating that the third party claimants there "could not rely upon the nonparental statutes in seeking custody of J.N.P., however, in light of their failure to comply with the statutory pre-requisites of first establishing a child-parent relationship through a petition filed under § 40-4-211, MCA." Opinion, ¶ 63. However, the third party claimants in *J.N.P. did* file a petition under § 40-4-211, MCA. *J.N.P.*, ¶ 22. Their claim was rejected, not for failing to satisfy this "statutory pre-requisite" (similar to the statutory pre-requisite in this case), but because the parents' constitutional rights were superior to the statute: "a natural parent cannot be denied custody of his or her child absent termination of that person's parental rights for abuse or neglect . . . ." *J.N.P.*, ¶ 25. Thus, we struck down § 40-4-211 because it suffered "from the

same constitutional infirmity as the statute we invalidated in the case of *In re A.R.A.*" *J.N.P.*, ¶ 21.

¶111 The Court dismisses the constitutional basis for our holding in *Polasek* on the ground that the grandparent visitation statute at issue there was "different" because here the Legislature has explicitly provided that it is "not necessary" for a natural parent to be found unfit before awarding a parental interest to a third party. Opinion, ¶ 69. In *Polasek*, the statute permitted mere grandparent *visitation* claims, and yet we held that the statute's failure to consider the wishes of a fit parent was unconstitutional. *Polasek*, ¶¶ 15, 20. Here, as we consider a third party's claim to a *parental interest* of a child, the Court bows to the Legislature's determination that parental unfitness need not be shown. The Court's reasoning is a non sequitur and its retreat from constitutional principle has permitted the Legislature to legislate Maniaci's constitutional rights out of existence.[1]

---

[1] The Court also states that, in our prior cases, third parties sought to "terminate the parental rights" of the natural parent in order to secure custody of a child "to the exclusion" of the natural parent. Opinion, ¶ 56. Without expressly saying so, the Court appears to imply that the subject statute is less invasive because it does not contemplate termination of the natural parents' rights and the complete taking of custody of a child away from a natural parent. However, first, the third parties in our prior cases did not seek the termination of parents' interests, but rather they sought to obtain custody without such termination. That is why we invalidated the statutes. *A.R.A.*, 277 Mont. at 72, 919 P.2d at 392. Secondly, § 40-4-228, MCA, does permit a court to grant a parental interest in a third party and transfer custody of a child to that party. Indeed, steps in that direction have occurred here. In its post-judgment orders, the District Court has ordered professional care to be given to Maniaci's children without notice to or involvement by Maniaci. It has restricted Maniaci's access to the children and to their records. Lastly, even if shared custody is ordered, the loss of custodial rights to a child is nonetheless extremely invasive and a violation of a fit natural parent's constitutional rights. As we have held, we apply strict scrutiny to "any infringement" upon a person's right to parent his or her child. *Polasek*, ¶ 15.

43

¶112 Although the Court goes to great lengths to dismiss the constitutional basis for our decisions, these decisions clearly stand for the proposition that "a natural parent cannot be denied custody of his or her child *absent termination of that person's parental rights . . . .*" *J.N.P.*, ¶ 25 (emphasis added). In my view, the Court's effort to distinguish our previous holdings is flawed and does not diminish the constitutional rights of parents we have clearly declared.

### The Constitutionality of § 40-4-228, MCA

¶113 We have previously struck down two similar statutes as unconstitutional for failing to require termination of a parent's interest before invading a parent's constitutional rights. *A.R.A.*, 277 Mont. at 72, 919 P.2d at 392 (stating the statute was "unconstitutional to the extent that it allows the granting of a § -221 petition prior to the termination of the natural parent's constitutional rights" by establishing abuse, neglect, or dependency); *J.N.P.*, ¶ 21 (The prior version of § 40-4-211(4)(b) "suffers from the same constitutional infirmity as the statute we invalidated in the case of *In re A.R.A.*").

¶114 The Legislature has enacted § 40-4-228, MCA, which states, in pertinent part:

> (2) A court may award a parental interest to a person other than a natural parent when it is shown by clear and convincing evidence that:
> (a) the natural parent has engaged in conduct that is contrary to the child-parent relationship; and
> (b) the nonparent has established with the child a child-parent relationship, as defined in 40-4-211, and it is in the best interests of the child to continue that relationship.
>
> * * *

(5) It is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party under this section.

¶115 First, this statute implicates a fundamental right. "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Thus, this statute is subject to strict scrutiny review. *Polasek*, ¶ 15 (We apply "close scrutiny" to "any infringement on a person's right to parent a child.").

¶116 This statute, like the prior statutes we have invalidated, invades the constitutionally protected natural parent-child relationship without first requiring termination of the parent's interests. This statute thus likewise fails to provide the protection of parental rights that is "constitutionally required," *A.R.A.*, 277 Mont. at 70, 919 P.2d at 391 (citing *Stanley v. Ill.*, 405 U.S. 645, 92 S. Ct. 1208 (1972)), and "[t]herefore, the result must necessarily be the same." *J.N.P.*, ¶ 23.

¶117 The reasoning employed by the Court to uphold this statute is flawed for several reasons. First, having dispensed with our precedent declaring the constitutional rights of parents, discussed above, the Court takes up the issue of the statute's validity in a constitutional vacuum, as if there is no guiding precedent. To fill this vacuum, the Court looks to the Legislature's expression of what the Constitution requires, deferring to the Legislature's constitutional interpretation. Opinion, ¶¶ 57, 70. However, it is the purview of the courts to determine the existence and nature of constitutional rights, not the Legislature's.

45

The Court thus fails to do its duty. *In re Lacey*, 239 Mont. 321, 326, 780 P.2d 186, 189 (1989) ("[T]he judiciary has authority over the interpretation of the Constitution . . . .").

¶118 Secondly, the Court offers no rationale explaining how a third party's relationship with a child can overcome, constitutionally, a fit and capable parent's right to raise the child. It offers no analysis about how the Legislature's elimination of the fitness requirement can withstand strict scrutiny. The Court simply declares that the Legislature's will trumps this Court's declaration of constitutional rights.

¶119 The Court defends the statute's constitutionality by offering that "Montana's nonparental statutes avoid constitutional infirmity under the *Troxel* standard through the twin thresholds of consideration of the wishes of the natural parent and the need to first establish a child-parent relationship." Opinion, ¶ 71. However, *Troxel* did not reach this question. The U.S. Supreme Court explicitly declined to reach the question of whether the U.S. Constitution requires that a parent allow harm to the child before the parent's rights can be invaded. *Troxel*, 530 U.S. at 73, 120 S. Ct. at 2064 ("[W]e do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context."). Thus, the pronouncements of this Court, not the U.S. Supreme Court, provide the constitutional guidance for this issue. And, as discussed above, we have repeatedly held that

46

the Constitution requires that a parent's interests must be terminated before the State can invade a natural parent's constitutional rights.

¶120 Finally, the Court vaguely references children's rights in defending the statute. The Court first states that Maniaci argues that her children "have no constitutionally protected rights, absent a showing of abuse, neglect, or dependency." Opinion, ¶ 54. That is incorrect. Maniaci does not argue that her children have no rights but, rather, that those rights are precisely as stated by this Court and the U.S. Supreme Court. The Court then offers that the statute is valid because it balances "the constitutionally protected rights of both the parents and children in determining the best interests of the child," Opinion, ¶ 70, but fails to state what the rights of either party are. I have explained above the parental constitutional rights declared by this Court. Similarly, this Court has explained that the constitutionally protected right of a child is "to be with his or her natural parent." *A.R.A.*, 277 Mont. at 71, 919 P.2d at 391 (citing *Stanley*, 405 U.S. at 652, 92 S. Ct. at 1213); *see also J.N.P.*, ¶ 17. This is the companion right to the right of the parent to raise his or her own child. This constitutional right of the child weighs in favor of the parent's rights.

¶121 For the reasons above stated, I would strike down the statute.

### *The Proper Interpretation of § 40-4-228, MCA*

> *"A court is never going to take a parent's right away without a significant period of just absolute disregard and abandonment [of] their children."*

> *--Sponsor, 1999 Statutory Amendments*

¶122 Even assuming for argument purposes that § 40-4-228, MCA, is valid and constitutional, a proper reading of the statute and a review of its legislative history reveals that it was not intended to provide the relief granted to Kulstad by the District Court.

¶123 It should not be necessary to repeat that "[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. However, here the District Court did that very thing—it inserted new language into the statute. The Court affirms the error.

¶124 Section 40-4-228(2), MCA, provides that a court may award a parental interest to a nonparent when "(a) the natural parent has engaged in conduct that is contrary to the child-parent relationship; and (b) the nonparent has established with the child a child-parent relationship . . . ." Thus, a plain reading of this provision establishes two requirements, one on the part of the natural parent (conduct contrary to the child-parent relationship), and one on the part of the third party (establishment of a child-parent relationship).

¶125 However, in applying provision 228(2)(a) to Maniaci, the District Court concluded that the provision was satisfied because Maniaci engaged in conduct contrary to "an *exclusive* child-parent relationship" with her children. Unable to hold from the evidence that Maniaci had acted in any way "contrary to the child-parent relationship," as the statute actually reads, the District Court was forced to add language to the statute—imposing a judicially-created "exclusive" requirement—in order to conclude that the provision had been satisfied.

48

¶126   The District Court's conclusion of law should be reversed because "exclusive" is not in the statute, and it is beyond the proper role of the District Court to insert that language. The Court affirms, discussing at length the evidence that Maniaci did not exclude all others from a child-parent relationship with the children. The Court states that "Maniaci repeatedly and continually acted contrary to her child-parent relationship," but the only supporting facts it cites are those showing that Maniaci acted contrary to an *exclusive* child-parent relationship. Opinion, ¶ 78. Further, the Court fails to explain why non-exclusivity is inherently contrary to Maniaci's child-parent relationship with her children. Critically, the Court's reasoning here demonstrates that, from now on, a parent who does not exclusively parent her child opens the door to a third party challenge to her parental rights.

¶127   Further illustrating the error in the Court's interpretation is the resulting collapse of the two separate statutory requirements into one. If Maniaci's action of allowing Kulstad to establish a parent-child relationship is conduct contrary to Maniaci's relationship with the children, then subsection 228(2)(a) and (2)(b) cease to be separate requirements. Satisfaction of 2(b) automatically satisfies 2(a). Thus, the only question is whether Kulstad has established a parent-child relationship. Applying the statute's plain language, I would not require that Maniaci's conduct satisfy an "exclusive" parent-child relationship.

¶128   Further, the legislative history of the 1999 Amendments illustrates that the District Court's order is not what the Legislature intended. In introducing SB 486, Senator Halligan explained that § 40-4-228, MCA, dealt with a "narrowly defined area," which he explained was "where biological parents are not doing their job." He emphasized in closing remarks

49

that the statute was "very narrow." He further explained that the provision allowing another person to stand "in loco parentis" to a child, (subsection 228(4)), is for those situations where a "parent has not conducted themselves in a way that's appropriate." Examples in the hearing included cases where "parents are gone for a long time"—"four or five years"—with "no child support, no contact, no anything." During this discussion, the sponsor was asked what the standards would be for determining if a parent had acted inappropriately, and the sponsor included this in his answer:

> A court is never going to take a parent's right away without a significant period of just absolute disregard and abandonment for their children.[2]

¶129    The evidence here utterly fails to demonstrate that Maniaci was "not doing [her] job," had failed to "conduct[] [herself] in a way that's appropriate," "has been gone for a long time" from her children, left her children with "no child support, no contact, no anything" for four or five years, or engaged for "a significant period of just absolute disregard and abandonment" of her children. Yet, these are the kind of situations the Legislature intended to address by the 1999 Amendments. The Court's failure to apply the statute as plainly written results in a grave interpretational error.

### The Consequences of the Court's Decision

¶130    From its emphasis on the facts of this case, it is apparent that the Court has found Kulstad's case to be factually compelling, as did the District Court, and, thus, has ruled in her favor. But the Court has not acknowledged the significance of the most fundamental

---

[2] See minutes and audio recording, 1999 House Judiciary Committee hearing, SB 486.

facts of this case: Maniaci is a parent, and Kulstad is not. This distinction involves much more than semantics. The Court fails to recognize the clearly differing legal rights arising out of this critical distinction between the parties, and that failure leads to consequences that go far beyond the resolution of this particular child custody dispute.

¶131 To hold for Kulstad, the Court has, remarkably, withdrawn or narrowed previously recognized constitutional rights of fit parents. It has removed the "jurisdictional prerequisite" of termination of the natural parents' rights, upholding a statute that allows a third party to establish a parental interest of a child even though that child already has a fit parent. While the initial consequence of this decision falls upon the litigants in this case, consequences of geometric proportion will fall in the future upon many fit parents. The Court's withdrawing of constitutional protection against third party parenting claims will permit many claims to proceed, which formerly would have been legally barred. Fit and capable parents will now be forced to defend against such third parties' claims. To be sure, many of these claims will be factually weaker than Kulstad's claim, and will no doubt fail. Nonetheless, parents will be forced to defend against them. The U.S. Supreme Court has recognized that "the burden of litigating a domestic relations proceeding can itself be so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated." *Troxel*, 530 U.S. at 75, 120 S. Ct. at 2065 (citation and quotations omitted).[3]

---

[3] Of course, Maniaci has now lost her right to make such "certain basic determinations" for her children as a result of this litigation.

51

¶132 Lest this be deemed as merely a "sky is falling" concern, it need only be noted that other cases raising these very issues are already pending before this Court. In *In re Parenting of J.D.B.*, DA 08-0505, a mother, whose fitness is uncontested, is defending against a third party parenting claim to her children by her mother-in-law, who has cared for the children. Citing the precedent relied upon by this dissent, the mother argues in her briefing that "[w]here third parties seek custody, it has long been the law of Montana that the right of the natural parent prevails until a showing of a forfeiture of this right . . . . This forfeiture can only result where the parent's conduct does not meet the minimum standards of the child abuse, neglect and dependency statutes." This is the argument made by this dissent and that any lawyer studying our precedent would make. *See also In re Parenting of L.F.A.*, DA 08-0456 (A natural mother argues that a third party "may not simply acquire parental interests in the children absent significant deference to [a mother's] constitutional rights.").

¶133 There will be many more such cases. A legacy of this decision is the legion of parents who will be forced to litigate in order to protect the rights that the Constitution once guaranteed to them. A single parent must now consider whether a new romantic relationship will jeopardize the right to parent her or his children by way of a future third party parenting claim. Other like situations abound. As argued by the Appellant in *L.F.A.*:

> Many parents will at times leave their children in the care of a non-parental partner when they are unable to watch the child. More well-off families might have a nanny who cares for a child or set of children from their birth. Not infrequently children will be closer to these caregivers than even their own parents. Is every boyfriend, girlfriend, relative, grandparent or professional

52

caregiver to be entitled to parenting rights just because they have cared for the child?

¶134 There will be further consequences as well. This case may well be reported as a legal victory for the rights of same-sex couples. Because both sides have stated that the parties' gender is not a determinative issue in this case, neither the Court nor this dissent has discussed it. Regardless, the implications of the decision go far beyond the gender of the particular parties at issue here. There are parameters in neither the statute nor this decision that limit the kind or number of parties and relationships that will be now subject to parenting claims. Before this decision, protection of parental constitutional rights, which required *termination* of a parent's rights before granting a parental interest to a third party, necessarily, by biology and the adoption laws, limited the number of parents a child could have. However, those inherent limits have now been removed by the Court.[4] Consequently, what if three or four adult partners develop a "parent-child relationship" with a child? Multiple-party clusters raising children, or polyamorous "families," are the next wave in societal relationship experimentation. *See* Jessica Bennett, Only You. And You. And You.: Polyamory—Relationships with Multiple, Mutually Consenting Partners—Has a Coming-out Party, Newsweek (July 29, 2009) (available online at http://www.newsweek.com/id/209164/page/1); Susan D. James, Polyamory: When One Spouse Isn't Enough, ABC News (June 18, 2009) (available online at http://abcnews.go.com/Health/US/Story?id=7870884&page=1). While it may be at least a

little while before a trial court concludes that such claims are in a child's best interest, claims to multiple parenting interests arising out of such communal living arrangements are now legally possible, making them inevitable.

¶135 The abandonment of constitutional principle for the expediency of today's decision will have long, far-reaching and negative impacts. I dissent and would reverse the District Court.

/S/ JIM RICE

---

[4] Kulstad was prohibited from adopting the children under the adoption laws, but the Court has not held that this prohibition barred Kulstad's claim. That argument was made by an amicus curiae.